STATE OF MONTANA, PLAINTIFF AND RESPONDENT,

*v.*

BASIL W. SMITH, DEFENDANT AND APPELLANT.

No. 9928.

Submitted Jan. 19, 1959. Decided Feb. 6, 1959.

334 Pac. (2d) 1099.

Worden & Worden, Missoula, for appellant. Donovan Worden, Missoula, argued orally.

Forrest H. Anderson, Atty. Gen., Thomas J. Hanrahan, Asst. Atty. Gen., Anthony F. Keast, County Atty., Missoula, for respondent. Thomas J. Hanrahan, Asst. Atty. Gen., argued orally.

MR. JUSTICE CASTLES:

The appellant, Basil W. Smith, was convicted on a charge of larceny of property held by him as a bailee under R.C.M. 1947, sec. 94-2701, subd. 2. The appeal is taken both from the judgment of conviction entered upon the verdict and from an order of the court denying a new trial.

There is little conflict in the testimony. The general fact

situation was this. Appellant Smith was president and general manager of a corporation known as the S. and S. Milling Company which operated a small sawmill. The two complaining witnesses, Ted and Frank Gustafson, brothers, were partners owning the Grizzly Bear Lumber Company, which also operated a sawmill and a planing mill. Their planing mill did "custom planing" and during the year 1955 planed some 70,000 board feet of lumber for the S. and S. Milling Company. Two carloads of this lumber were shipped and are not involved in this case. A balance of some 8,000 board feet of lumber belonging to the S. and S. Milling Company remained on the Grizzly Bear Lumber Company premises. In September of 1955, as appears hereafter in detailed testimony, an arrangement was made between appellant Smith and complaining witness Ted Gustafson to ship a joint carload of lumber, to be made up of the 8,000 board feet of lumber belonging to the S. and S. Milling Company and the balance belonging to the Grizzly Bear Lumber Company.

This carload of lumber was loaded by the Grizzly Bear Lumber Company. It was shipped and sold by the S. and S. Milling Company. Proceeds of the sale were received by Smith and deposited to the account of the S. and S. Milling Company. No amount was ever paid to the Grizzly Bear Lumber Company for their share of the carload.

At this point, the testimony is in somewhat of a conflict. The state and its chief witness, Ted Gustafson, contend there was a bailment of the partial carload of lumber; that there was an agreement to pay over the share of the proceeds; and that the transaction did not constitute a sale. Further, it is the state's position that the transaction was a personal one with Smith, and not one with the corporation. This latter facet of the case will not be enlarged upon in view of what will hereafter appear.

For the purpose of this opinion, we shall assume that the transaction represented a bailment between the parties as urged by the State. This assumption may not be warranted, but as we view the case, but one matter is determinative of this appeal. That matter is as to the proof of a criminal intent.

The transaction took place between Smith and Ted Gustafson. Ted Gustafson's testimony is the only testimony which reflects the situation and upon which the state's case depends. Therefore, the fact situation reflecting on criminal intent can best be set out by partial quotes of this prosecuting witness, Ted Gustafson:

"Q. How did that [the transaction leading up to the charge] come about? A. Well, Mr. Smith [the defendant who was president and general manager of S. and S. Milling Company] contacted me to plane out approximately 70,000 feet of lumber.

"Q. About when? A. Oh, that was the latter part of September, I imagine, the first part of October. So, in the process of planing this 70,000 feet, which constitutes little more than two carloads, so we planed two carloads of—which developed No. 3 and 4 lumber, which we loaded and shipped for him, and out of planing that much lumber there was about 8,000 feet of No. 2 pine lumber that developed out of planing that much— just mill run of lumber, as we call it. So I had contacted Mr. Smith and asked him what he wanted to do with the balance of that 8,000 feet of lumber. * * *

"Q. Well, what was the reason for this contact now, again? A. To question him what he wanted to do with the balance of the lumber that he had left in our yard over there, and he informed me that—well, he asked me if we had any No. 2 pine that belonged to us, and I said we did. We probably had enough to constitute a car, with what belonged to him. So he told me that he had an order for a carload of pine, No. 2 pine, to go ahead and load his in the car as well as mine, or ours, my brother and I, and that when he got the proceeds from the car he would turn that amount of money over to me for our share of the car, which arrangement was completed, and we went ahead with it. * * *

"Q. Do you know exactly how much of your lumber went into the car? A. I do.

"Q. And how much was that? A. There was 21,992 feet, which we were paid off at the rate of $84.50 per thousand, amounted to a total of $1,858.32.

"Q. Well, what was—how was this value ascertained, do you recall? A. Well, Mr. Smith had the order for the car, and I didn't know the price that the lumber was sold for until after he had gotten the returns, and he told me what the lumber was per thousand feet, after he got the returns from the car. * * *

"Q. Was this transaction evidenced by anything, Mr. Gustafson? A. What—

"Q. By that I mean, was it in writing of any— A. No, it was just a verbal conversation between Mr. Smith and myself.

"Q. Well now, just what was your understanding of this transaction? A. Well, we were to load out this particular lumber that's in question, which was ours, and we in turn at the time that the car was shipped and the proceeds were received for the lumber, that we were to be turned over our share of the proceeds for the amount of lumber that we had in the car. * * *

"Q. Did you authorize Mr. Smith, the defendant, to do anything in particular with the proceeds of this car? A. I did not. It was my understanding that we were to get our share of the proceeds of the car upon receipt of the same.

"Q. And from whom? A. From Mr. Smith. * * *

"Q. This may be objected to, but what was your understanding of Mr. Smith, the defendant's status in handling your lumber in this transaction? A. Well, I just assumed on the oral conversation that we had on a joint loading of the car, which this was, that we would receive our proceeds for our share when the money was received for that particular car of lumber. * * *

"Q. Were you informed by the defendant that it had been sold? A. Yes, I was.

"Q. When? A. Well, it was probably—I don't recall, two to three weeks from the time that the car was shipped before I got notification that the car was sold, and the price that the lumber was sold for.

"Q. Who notified you? A. Mr. Smith.

"Q. And where? A. Well, he probably, as I recall it, called me up on the phone. I asked about it numerous times, and

finally after at least two weeks, why he informed me that they had received the returns for the car.

"Q. And where had he received them, under your understanding? A. Well, the check had been mailed to him, and he in turn told me that it was deposited in the bank to his account. * *

"Q. Were these receipts turned over to you? A. They were not.

"Q. Were you informed of what had happened to them? A. Yes.

"Q. By whom? A. Well, I think by both the bookkeeper over there, and Mr. Smith, both.

"Q. Well, with reference to Mr. Smith only, what was his statement as to the disposition of these proceeds? A. Well, they were short of money for their business, and they had to use our money for running of their business.

"Q. Well, did he inform you of how this was done? A. Well, he said they deposited it to the bank to their account."

From the record it also appears that the two companies, because they dealt with each other quite often, were in the habit of maintaining running open accounts to record intercompany payments and lumber shipments. The pertinent entries regarding the lumber in question were made as any other entry might be. Thus, on the books kept by the Gustafson company the amount due them from the S. and S. Company was recorded as an account receivable; and the S. and S. Company recorded it as an account payable.

The two companies continued to do business with each other through the succeeding months until in February 1956, the S. and S. Milling Company failed. The last attempt of the Gustafsons to collect for the carload of lumber was made in the spring of 1956, and this charge was brought in November 1957.

The appellant makes twelve specifications of error raising three general questions. These may be classed as, error in allowing the case to come to trial under an insufficient information, *refusing to dismiss the action for failure of proof,* and giving and refusing instructions improperly.

It is elemental that the necessary ingredient of a crime, as distinguished from a civil trespass, is the existence of a criminal intent. R.C.M. 1947, sec. 94-2701, sets forth:

"*Larceny defined.* Every person who, with the intent to deprive or defraud the true owner of his property, or of the use and benefit thereof, or to appropriate the same to the use of the taker, or of any other person * * *"

In State v. Labbitt, 117 Mont. 26, 32, 156 Pac. (2d) 163, 165, we said:

"It is elementary that the taking of property temporarily and with the intention of returning it is not larceny. The *animus furandi,* or intent to steal, is an essential element of the crime of larceny. 'It is this intent which distinguishes larceny from a mere civil trespass. Every taking of another's property without legal justification is a trespass upon the owner's right to its continued possession, but it does not constitute a crime unless the act is perpetrated feloniously, that is with *animus furandi* or with the intent to steal.' 36 C.J. Larceny, sec. 101, p. 763. 'Every taking and carrying away by one person of the personal property of another is not larceny even though it is done without right or claim of right and for the purpose of appropriating the property to the use of the taker. Super-added to the wrongful taking there must be a felonious intent, for without it there would be only a bare trespass which, however aggravated, would not be crime. It is the criminal mind and purpose going with the act which distinguishes a criminal trespass from a mere civil injury.' 32 Am. Jur., Larceny, sec. 36, p. 925."

The instant case shows a complete lack of proof of the criminal intent necessary. At the worst, it can only be said that an aggravated trespass was committed.

The intent required, of course, may be found from the facts and circumstances surrounding the transaction, but the mere existence of an unpaid debt, as shown by this testimony, does not demonstrate any intent to fraudulently appropriate the property. Generally in such a case as this there is evidence of a deliberate attempt to hide, to lie, or to cheat or some other

action inconsistent with an ordinary debtor-creditor relationship. " 'To constitute larceny, the party committing the offense must have the view of converting the property to his own use *permanently,* or depriving the owner of his property permanently.' Territory v. Paul (1875), 2 Mont. 314, 319." State v. Labbitt, supra, 117 Mont. at page 32, 156 Pac. (2d) at page 165.

The only possible circumstance which would indicate an intent to fraudulently deprive the Grizzly Bear Lumber Company of its money permanently is the assertion by Ted Gustafson, one of the complaining witnesses, that the defendant did not inform him of his receipt of the proceeds until some two or three weeks after the car was loaded and shipped. However, there is nothing in the record to indicate even roughly the date this remittance was received by Smith so we are in no way able to infer that he concealed, even for a short time, his receipt of the money.

We are inclined to regard the fact that two years and more elapsed between the transaction and the filing of the complaint as significant. During this period of time, the complaining witnesses treated the transaction as one in the regular course of business and the conversations, testified to, were an attempt to collect a debt owing them as a partnership from a defunct corporation by looking to the managing officer for personal payment.

Because the state completely failed to prove criminal intent, the trial court should have granted the defendant's motion to dismiss at the conclusion of the State's case.

Because of the determinative nature of our finding with regard to the lack of proof of intent, it is not necessary to indulge in a lengthy discussion of the errors assigned involving the information or the instructions.

For the foregoing reasons, the judgment of conviction is reversed. The cause is remanded to the district court, and ordered dismissed.

MR. JUSTICE BOTTOMLY, ACTING CHIEF JUSTICE, MR. JUSTICES ADAIR and ANGSTMAN, and THE HON-

26

ORABLE PHILIP C. DUNCAN, District Judge, sitting in place of MR. CHIEF JUSTICE HARRISON, concur.