No. 12079

IN THE SUPREME COURT OF THE STATE OF MONTANA

1972

---

THE STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

NICHOLAS ARTHUR KARATHANOS,

Defendant and Appellant.

---

Appeal from: District Court of the Thirteenth Judicial District,
Honorable C. B. Sande, Judge presiding.

Counsel of Record:

For Appellant:

Sandall, Moses and Cavan, Billings, Montana.
Charles F. Moses argued, Billings, Montana.

For Respondent:

Hon. Robert L. Woodahl, Attorney General, Helena,
Montana.
J. C. Weingartner, Deputy Attorney General, argued,
Helena, Montana.
Harold F. Hanser, County Attorney, argued, Billings,
Montana.

---

Submitted: January 11, 1972

Decided: FEB 1 1972

Filed: FEB 1 1972

*Thomas J. Kearney*
Clerk

Hon. Frank E. Blair, District Judge, sitting for Associate Justice Wesley Castles, delivered the Opinion of the Court.

In this cause defendant, Nicholas Arthur Karathanos, was charged with the criminal sale of dangerous drugs in Yellowstone County and was convicted by a jury on March 30, 1971. On April 13, 1971, he was sentenced to imprisonment in the state prison for a period of twenty years. Shortly thereafter, defendant was admitted to bail in the sum of $15,000, which was furnished. On June 1, 1971, defendant appealed.

Substantially the facts in this case are:

Defendant is 32 years of age, unmarried, a field systems engineer for Collins Radio Company and has never previously been charged with any crime. On February 13, 1970, defendant was introduced to Hazel Jean Langford at the Circle Inn, Billings, Montana, by a bar maid. Defendant was in the company of a man named Thornton. The three sat down at a table adjacent to the bar at the Circle Inn. Defendant ordered a round of drinks. During the ensuing conversation, defendant asked Mrs. Langford what kind of stuff she wanted. Mrs. Langford asked him what kind of stuff he had. He replied "that he only had Dexedrine left." Defendant then asked what she wanted that night and she informed him that she had $40. Defendant said that he could sell her 100 caps of Dexedrine for $12. She told him that she had $500 set aside to buy stuff with; defendant then stated that he could sell her 4,000 caps of Dexedrine for $480, and he would deliver them the next day between 1:00 and 2:00 o'clock, p.m. He also told Mrs. Langford "that he had a drop and that he never kept the stuff in his apartment, and he said also, 'I wholesale only, if I were to push on the street I would be busted in two days.'"

Defendant and Mrs. Langford then went outside the Circle Inn, where defendant's car was parked. Both got in the car and defendant reached under the seat and pulled out a package of 100 caps of Dexedrine; Mrs. Langford paid him $12 and he gave her the Dexedrine. The next day defendant called on Mrs. Langford at an apartment she was occupying temporarily. She offered defendant a cup of coffee and they sat down and talked for a few minutes. He asked her if she had the "bread" ready. She said "yes". She actually had three $100, two $50 and five $20 bills, all of which was marked money given her by the sheriff's office, her employer. Defendant, upon learning the money was available, went out to his car and returned in a few minutes with four cellophane packages containing about 1,000 tablets each, i.e. 4,000 in all, for which Mrs. Langford paid him $480 in marked money. Defendant put the money in his front pants pocket. Mrs. Langford, a bit later, turned over the tablets of Dexedrine to Jim Meeks, then a deputy sheriff. Defendant was arrested by sheriff's officers as he left Mrs. Langford's apartment.

During her conversations with defendant, Mrs. Langford had an electronic transmitter concealed on her person and the sheriff's office could hear much, if not most, of the conversation between them. The sheriff's office explained that this was done primarily for Mrs. Langford's protection.

The defense called as a witness one Dr. Wesley Duane Albert, a licensed physician and surgeon from Laguna Beach, California, who had practiced fifteen years, specializing in nutrition, obesity and chronic diseases such as diabetes and arthritis. The doctor first met defendant in the spring of 1968 and treated him in August 1969, at which time defendant's case

was diagnosed as a moderate form of narcolepsy. Defendant testified that prior to contacting Dr. Albert he had been injured in Saigon and thereafter would fall asleep momentarily, for no apparent reason. Dr. Albert prescribed dextro-amphetamine sulphate in an amount of 5,000 capsules. Dexedrine is a trade name for dextro-amphetamine sulphate. The quantity, as explained by the doctor, was because defendant represented to him that his employer was going to send him to South America in the spring of 1970, for several years, possibly even four or five years. Dr. Albert had not seen the defendant since he gave him the 5,000 capsules of the drug prescribed, until the trial.

Defendant raises seven issues for review on this appeal. They can be briefly summarized as follows:

A. Did defendant come within the exceptions of the Montana Dangerous Drug Act?

B. Was there evidence sufficient to convict and prove that defendant did not come within the exceptions of the Montana Dangerous Drug Act?

C. Did the trial court err in refusing to grant the defendant's motion to dismiss at the conclusion of the state's case?

D. Did the trial court err in refusing to give defendant's offered instructions 18, 19, 20, 21 and 22?

E. Are sections 54-131 and 54-132, R.C.M. 1947, of the Montana Dangerous Drug Act so ambiguous and uncertain, in that the acts prohibited are not sufficiently set forth, as to bar prosecution?

F. Was punishment of twenty years in the state prison cruel and unusual punishment under the facts in this case?

G. Was there entrapment in this case?

Issues A,B,C and E can be treated together but before our discussion we set forth pertinent testimony of Dr. Wesley Albert:

"Q. Would you tell us what medication you prescribed?

"A. I prescribed a dextro-amphetamine sulphate.

"Q. Do you know how many capsules you gave to him, or dispensed to him at that time?

"A. Yes, I gave him 5,000 capsules."

From this testimony it appears that Dr. Albert was a dispensing physician and carried his own drugs. It does not appear that he wrote a prescription, nor that a prescription was "filled" at a local or other pharmacy. Dr. Albert, himself, dispensed 5,000 Dexedrine capsules to defendant.

The law under which defendant was charged is section 54-132(a), R.C.M. 1947:

"(a) A person commits the offense of a criminal sale of dangerous drugs if he sells, manufactures, prepares, cultivates, compounds or processes any dangerous drug as defined in this act and does not come within the exceptions of section 3 [54-131]."

Regular physicians and surgeons may prescribe drugs for their patients in writing, or dispense. We assume that Dr. Albert dispensed 5,000 capsules of Dexedrine to the defendant, in full conformity with California law. There is nothing in the record to indicate otherwise, whatever we may think of the impropriety of dispensing 5,000 capsules of Dexedrine at one time, to one person, by a physician who is a medical doctor.

Section 54-131, R.C.M. 1947, reads in material part:

"(2) The following persons are excepted from the designated criminal offenses of sections 4 and 5 [54-132 and 54-133] of this act while acting in the ordinary and authorized course of their business, profession, occupation, employment or religious activity and whose activities in connection with dangerous drugs are solely as specified in this section; * * *

> "(j) A person to whom or for whose use
> any dangerous drug has been prescribed, sold,
> or dispensed by an authorized practitioner or
> pharmacist may lawfully possess such drug."

Under the evidence here we are of the opinion that the defendant

lawfully possessed the Dexedrine capsules in evidence in this

case.

However, what we are concerned with here is not his

possession, but the sale of the lawfully possessed drug to

the sheriff's undercover agent. The argument of defendant that

section 54-132, R.C.M. 1947, precludes prosecution for the sale

of dangerous drugs by a person who comes within section 54-

131(2)(j), R.C.M. 1947, is without merit. Subsection (j) is

not an exemption of status but of certain activities and is

controlled by section 54-131(2), which reads:

> "(2) The following persons are excepted from
> the designated criminal offenses of sections
> 4 and 5 [54-132 and 54-133] of this act while
> acting in the ordinary and authorized course of
> their business, profession, occupation, employ-
> ment, or religious activity or whose activities
> in connection with dangerous drugs are solely as
> specified in this section." (See Subdivisions
> (a) through (k)).

Thus defendant's argument that he is exempt is without

foundation. Section 54-132, R.C.M. 1947, is clear and unambiguous,

so clear and unambiguous in fact, that it construes itself. So,

too, is subdivision (2) of section 54-131, R.C.M. 1947. Sub-

divisions (a) through (k), under section 54-131(2), except

from designated criminal offenses of sections 54-132 and 54-133,

those acting in the ordinary and authorized course of their

business, profession, occupation, employment or religious activity

and whose activities in connection with dangerous drugs are solely

as prescribed in this section.

- 6 -

Defendant, under section 54-131(2)(j), R.C.M. 1947, in the context in which it appears and under the evidence, was legally authorized to possess and use in the treatment of his "narcolepsy" the 5,000 capsules of Dexedrine as directed by Dr. Albert, but in no means was he authorized to sell them in outright defiance of the plain terms of section 54-132, R.C.M. 1947.

The contention of defendant that it was the duty of the state to plead and prove that defendant did not come within the exceptions stated in section 54-131, R.C.M. 1947, is without foundation. The state is not bound to negate an exception contained in a statute; such an exception as we are considering here is a matter of defense. In Fitzpatrick v. Stevenson, 104 Mont. 439, 443,444, 67 P.2d 310, we reaffirmed the following rule:

> "It has often been said by this court that in a criminal case, it is not necessary for the state in its information to negative an exception contained in the statute, but such exception is matter to be asserted in defense. (Citing cases)."

It not being necessary to plead in the Information the exception referred to in section 54-132, R.C.M. 1947, it was not necessary for the state to prove that the defendant did not come within the exceptions stated in section 54-131, R.C.M. 1947. In State v. Davis, 141 Mont. 197, 201, 376 P.2d 727, following Stevenson, this Court in referring to an exception said:

> "Not being necessary to allege it, it was not necessary to prove it."

Issues A,B,C, and E are without merit and the action of the trial court in refusing to grant defendant's motion to dismiss at the close of the state's case was correct.

Issues D, F and G remain to be resolved. This we shall do *seriatim*.

D. Defendant's proposed instructions 18, 19, 20, 21 and 22 follow substantially the same theory as we have discussed under issues A,B,C, and E. We have carefully read the testimony in this case and have studied the proposed instructions and find them to be without merit.

F. Was punishment of twenty years in the state prison cruel and inhuman punishment under the facts of this case?

Reasoning from cause to effect, it must be recognized that the sheriff of Yellowstone County did not employ an undercover agent and rent an apartment for her to operate from in making an appointment with defendant for the purchase of drugs, absent previous suspicious conduct on the part of defendant in the dangerous drug area. This reasoning is fortified by the results of the presentence investigation which appears in the district court file. Presentence investigations may be considered by the court before the pronouncement of sentence. Section 95-2203, R.C.M. 1947; Petition of Jerald A. Armor, 143 Mont. 479, 389 P.2d 180.

Sentence was imposed pursuant to the provisions of section 54-132, R.C.M. 1947, which provides in pertinent part:

> "(b) A person convicted of criminal sale of dangerous drugs shall be imprisoned in the state prison for not less than one (1) year, nor more than life * * *".

Being over 21 years of age, defendant was sentenced to twenty years in the state prison. Defendant contends this sentence was cruel and unusual punishment. At the time of sentence, defendant was a fully grown man, 32 years of age, of unusual ability

in the electronics field in which he earned $12,000 per year.
No urgent monetary motive appeared for him to "push" dangerous
drugs. The motivating force behind the sale of the first 100
Dexedrine capsules to Mrs. Langford, by his own testimony, was
apparently his lust for her body.

Moreover, the trial court could properly consider the
fact of his purchase of 5,000 Dexedrine capsules from the Cali-
fornia doctor was, in the light of his sale of 4,000 capsules to
the sheriff's undercover agent, a circumstance which was indica-
tive of a course of conduct and smacked of various other sales
and a modus operandi.

It is the general rule that a sentence within the maximum
authorized by statute is not cruel and unusual punishment. The
Ninth Circuit Court of Appeals in Black v. United States, 269
F.2d 38, 43, affirmed a thirty year sentence on a narcotic charge.
There appellant, then 51 years of age, argued that this amounted
to life imprisonment. The maximum punishment in Montana for the
crime which defendant was charged with, is life imprisonment.
Black was denied certiorari by the United States Supreme Court.
361 U.S. 938, 80 S.Ct. 379, 4 L.ed 2d 357.

In Black is language applicable to this case:

"The Eighth Amendment was adopted to prevent
inhuman, barbarous, or torturous punishment.
It is possible for the length of a sentence to be
so disproportionate to the offense as to fall
within the inhibition. Hermans v. United States,
6 Cir. 163 F.2d 228, 237. Ordinarily, however,
where the sentence imposed is within the limits
prescribed by the statute for the offense com-
mitted, it will not be regarded as cruel and
unusual. Edwards v. United States, 10 Cir. 206
F.2d 855. In our view the aggregate sentence
imposed on Black is not so disproportionate
to the offense committed as to offend the Eighth
Amendment ban."

There is no merit to this assignment of error. The trial court observed the defendant testify. It was vested with a wide discretion in fixing the punishment. No abuse of discretion appears. An excellent treatment of "Cruel Punishment-Length of Sentence" appears in 33 ALR3d 343, et sequentia.

G. Was there entrapment in this case?

A resolution of this question requires a brief review of the evidence. On February 13, 1970, Hazel Jean Langford, an undercover agent for the sheriff's office of Yellowstone County, went to the Circle Inn at Billings under the direction of that office. She had an electronic transmitter concealed on her person. After entering the bar, she was introduced to defendant. The defendant, Mrs. Langford, and another, sat down at a table and ordered drinks. In the ensuing conversation, defendant asked Mrs. Langford what kind of stuff she wanted. She in turn asked him what kind he had, to which he replied that he only had Dexedrine capsules left. He again asked her what she wanted and she told him she only had $40. He then told her he could sell her 100 Dexedrine caps for $12. She told him that she had $500 set aside to buy stuff, and he informed her he had 10,000 caps of Dexedrine and that he would sell her 4,000 for $480. Defendant and Mrs. Langford then went to his car, where he delivered a package of 100 capsules of the drug.

The next day defendant telephoned Mrs. Langford and told her he would deliver the 4,000 capsules at 4 p.m. At that time he came to her apartment where he delivered four cellophane packages each containing 1,000 capsules of Dexedrine, for which she paid him $480 in marked currency, supplied to her by the sheriff's office. Mrs. Langford specifically testified:

"Q. Mrs. Langford, when you first met the defendant, Mr. Karathanos, did he offer to sell you, or did you offer to buy?

"A. He offered to sell."

On cross-examination she testified to the same thing and denied that she first made an offer to purchase.

Defendant now contends that he was entrapped into committing the offense charged. With this contention, we cannot agree. Entrapment occurs only when the criminal intent or design originates in the mind of the police officer or informer and not with the accused, and the accused is lured or induced into committing a crime he had no intention of committing. Only when the criminal design originates, not with the accused, but in the mind of government officers and the accused is by persuasion, deceitful representations, or inducement, lured into the commission of a criminal act, can a case of entrapment be made out. In short, there is a controlling distinction between inducing a person to do an unlawful act and setting a trap to catch him in the execution of a criminal design of his own conception. The fact that the Yellowstone County sheriff's office afforded the opportunity or facility for the commission of the offense, does not come within the entrapment rule. In this class of offenses, usually committed secretly, it is difficult if not almost impossible to secure the evidence necessary to convict by any other means than by the use of decoys. Certainly, there can be no objection to their use if the officers do not by persuasion, deceitful representations or inducement, lure a person who otherwise would not be likely to break the law, into a criminal act. State v. Wong Hip Chung, 74 Mont. 523, 241 P. 620;

State v. Parr, 129 Mont. 175, 283 P.2d 1086; 22 C.J.S. 137, §§ 45(1), 45(2), 45(4).

Finally, we consider the use of the electronic transmitter as an incident of the claimed entrapment. This device was used by the sheriff for the protection of his employee, Mrs. Langford. The tape was not used at the trial; therefore, defendant was in no manner prejudiced by its use.

In United States v. James A. White, _____U.S._____, 91 S.Ct._____, 28 L ed 2d 453, the view was expressed that police eavesdropping on conversations between an accused and an informant by means of a radio transmitter concealed on the informant's person, does not violate the Fourth Amendment of the United States Constitution any more than does an informant reporting on or secretly recording the conversations.

There was no entrapment.

Finding no reversible error, we affirm the judgment of the trial court.

_____
Hon. Frank E. Blair, sitting
in place of Associate Justice
Wesley Castles.

We Concur:

_____
Chief Justice

_____

_____

_____
Associate Justices.

- 12 -