No. 12116

IN THE SUPREME COURT OF THE STATE OF MONTANA

1972

———————

THE STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

FRANK L. ANDERSON,

Defendant and Appellant.

———————

Appeal from: District Court of the Seventeenth Judicial District, Honorable Thomas Dignan, Judge presiding.

Counsel of Record:

For Appellant:

Kenneth Wilson, Miles City, Montana.
Roland Colgrove, Miles City, Montana.
Gene Huntley argued, Baker, Montana.

For Respondent:

Hon. Robert L. Woodahl, Attorney General, Helena, Montana.
J. C. Weingartner, Deputy County Attorney, appeared, Helena, Montana.
William J. Krutzfeldt, argued, Miles City, Montana.

———————

Submitted: April 19, 1972
Decided: JUN - 7 1972

Filed: JUN - 7 1972

<u>Thomas J. Kearney</u>
Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

Defendant, Dr. Frank L. Anderson, an osteopath, was charged under section 54-132, R.C.M. 1947, in the district court of the sixteenth judicial district, county of Custer, of wilfully, unlawfully and feloniously selling a stimulant drug, being described as d'amphetamine. Following a plea of "not guilty", defendant was granted a change of venue and he was tried before a jury and found guilty in the district court of the seventeenth judicial district, county of Valley. Defendant moved for a new trial, which was denied. He now appeals from the final judgment.

On December 1, 1969, Vicky Morrison went to Dr. Anderson's office to buy some diet pills, since she was interested in losing weight. At trial, she testified for the state as follows:

> "Well I went in and asked him for diet pills and then that's when he told me there was other ways to reduce and I said 'Well I don't have time' and I * * * he asked me how many I wanted and I said $5.00 worth so he just took them and dumped them in this envelope and give them to me."

The price of the pills was five cents each and they were placed in an envelope which contained Dr. Anderson's name and address in its upper left hand corner.

Vicky Morrison had learned that Dr. Anderson had diet pills from her cousin, Beth Bickel, who had also purchased diet pills from Dr. Anderson. At trial, Beth Bickel, as a state witness, gave the following testimony:

> "Q. And what was the date as best you can recollect that you purchased the pills? A. November 28th, 1969.
>
> "Q. Now as best as you can recollect tell the Court and the Jury what occurred when you bought the pills. A. I went to his office and asked him if I could get some diet pills and I asked him how much they were. I asked him how much they were and he said about 5 ¢ a piece. I said well I want $3.00 worth then. He

went back into his office, his examining room or something and brought out this little bottle of pills....it wasn't very big.....and I just wrote out the check. I asked him if he would take a check and he said 'yes' he would and I gave it to him and that's about all."

On December 15, 1969, in an unrelated criminal case, Vicky Morrison was arrested for larceny. In connection with the larceny investigation her luggage was searched and the diet pills discovered. The pills were given to Sheriff William Damm of Custer County, who then sent them to the Bureau of Narcotics in San Francisco for analysis. Mr. James Look of the Bureau examined the pills and at trial testified the pills contained d'amphetamine, which may be sold only by medical doctors or other licensed physicians pursuant to the Montana Dangerous Drug Act, sections 54-129 through 54-138, R.C.M. 1947. Dr. Anderson does not fall into the class of licensed physicians under the Act.

After Beth Bickel was notified by Sheriff Damm to give the pills she had purchased from Dr. Anderson to him, she told Dr. Anderson that the sheriff had taken the pills. Thereupon, Dr. Anderson called the sheriff who testified at trial for the state that the following conversation then took place:

"Q. And he said 'What's going on' and made some inquiry along those lines, is that right? A. Yes.

"Q. And I have down here now what you told me was, and I have it down in quotes as if I'd copied it verbatim.....'You've been selling some drugs to girls'. Now is that what you told me? A. Something along those lines.

"Q. And then his response to this was and I wrote it down and/my recollection is I read it back to you ....'I thought they were diet pills. If they, if they were drugs I sure won't sell any more.' A. Yes.

"Q. That's what he said to you, right? A. Yes.

"Q. And that was the end of the conversation? A. Yes."

Throughout the presentation of the state's case, the capsules called diet pills were referred to solely as diet pills and no other designation was given to the pills.

At the conclusion of the state's case, defendant moved to dismiss upon the grounds the prosecution had failed to prove that defendant had "* * * notice or knowledge that the pills that he sold contained an ingredient of a dangerous drug * * *".

Defense counsel argued that none of the participants in the sale knew that the diet pills contained a prohibited substance and that possession alone from the evidence produced by the state did not give any conclusion that the defendant had knowledge or intent to deal with prohibited substances in violation of the Montana Dangerous Drug Act. It was argued that the transactions were handled as ordinary commercial transactions, the pills were sold for a modest amount, paid for by check, and in one instance delivered in an envelope with defendant's printed name and address.

After denial of defendant's motion to dismiss, defendant took the stand and testified that he had no knowledge the capsules contained a dangerous drug and he had not heard the word "amphetamine" until after his arrest.

Defendant, Dr. Frank L. Anderson, has been a practicing osteopath in Miles City since 1926. He officed near and was on friendly terms with one Dr. Lindeberg, a medical doctor in Miles City, who practiced medicine until she fell and broke her hip sometime in the middle 1960's and was unable to continue office practice. Dr. Lindeberg continued to practice at home but her condition became progressively worse. In 1968 she called defendant and asked him to visit her, as defendant had previously done on numerous occasions. At that time, Dr. Lindeberg stated to defendant that she realized she would be unable to continue

her medical practice and wished to give defendant a box of supplies consisting of assorted bandages, tapes, salves, bottles of medicines, and a brown bottle with tape on it marked "diet pills". Dr. Lindeberg died in 1969.

Defendant gave the following testimony regarding the "diet pills":

"Q. Now did one of those bottles contain pills? A. A big bottle---this big brown bottle and it had a tape on there that said 'diet pills'.

"Q. I see and did you discuss this situation with her? A. I asked her what they were....what the ingredients were. She said 'They're harmless. You don't need to worry about them. I take them myself'.

"Q. And that was the diet pills you referred to? A. Yes.

"Q. Was anything said about taking care of some of her patients later on? A. She knew, she said 'Now people will still want some of these pills and they call me on the phone I'll send them to your office and you give them some of these. You give some of these out to them."

On cross-examination of the forensic chemist, Mr. James Look, it was developed that the actual determination of the presence of amphetamine was a complicated analysis requiring a skilled chemist and a furnished laboratory, and the presence of amphetamine cannot be determined by appearance alone.

At the conclusion of the case, the defendant renewed his motion to dismiss on the grounds previously urged---that the state failed to prove defendant's knowledge that the pills contained an ingredient of a dangerous drug.

Appellant presents two issues on appeal:

"(1) May one be convicted of selling a dangerous drug when he had no knowledge that the material he was selling contained such a drug?

"(2) When defendant denies knowledge that the material he sold contained a dangerous drug should the matter of his knowledge be determined by the jury

or is criminal knowledge conclusively presumed
from possession alone?"

The underlying issue here is the proof by the state that is required to establish knowledge of the prohibited substance sufficient to form the required intent to make the sale criminal under the Montana Dangerous Drug Act.

Appellant contends, among other things, that the court's instruction No. 5 and particularly the last half of that instruction is a clear misstatement of the law. The instruction reads:

> "You are instructed that the State does not have to show direct evidence that the Defendant intended a criminal act; <u>if you believe that the Defendant sold dextro (d) amphetamine diet capsules which he knew were in his possession and under his physical control, the law implies knowledge by the Defendant of facts necessary to make the sale criminal.</u>"
> (Emphasis supplied)

This problem was thoroughly discussed by this Court in State ex rel. Glantz v. Dist. Court, 154 Mont. 132, 140, 461 P.2d 193 (1969). This discussion is particularly significant as it was a proceeding to challenge section 54-133, R.C.M. 1947, on this point.

The following is the pertinent part of the Court's discussion in <u>Glantz</u>:

> "Section 54-133, R.C.M. 1947, states:

> "'A person commits the offense of criminal posession of dangerous drugs if he possesses any dangerous drug as defined in this act and does not come within the exceptions of section 3.'

> "Relators apparently feel that the lack of definition within the act <u>of the requirements for possession is fatal. However, the crime of possession of prohibited articles has traditionally carried with it the requirement that the possession be knowing and intentional.</u> In State v. Hood, 89 Mont. 432, 436, 298 P. 354,355, this Court said: 'To justify a conviction of unlawful possession of a prohibited article, there must be proof of actual control and management of the thing prohibited'. The meaning of the term 'possession' has been so well defined by this Court and in other jurisdictions that it is hardly ambiguous, thus the lack of any specific definition does not detract from the clarity of the act in question.

"The Uniform Narcotics Drug Act was adopted many years ago in 46 states and was repealed in Montana by the 1969 legislature. The Montana Dangerous Drug Act replaced it. The Uniform Act is mentioned here for one purpose---section 2 of that act provided that it shall be unlawful for any person to manufacture, possess, have under his control, sell, prescribe, administer, dispense or compound any narcotic drug except as authorized by the act. In 91 A.L.R.2d 810, cases are cited which define the term 'possession' for the purposes of the section mentioned above. The similarity between this section of that act and the present act in Montana is obvious; knowledge of the alleged possessor or his intention to possess is not mentioned in either statute as an element of the offense prohibited. However, no case under the Uniform Act has been found where the defendant's conviction of illegal possession of narcotics has been sustained if the prosecution failed to prove, either directly or by inference, that the defendant had knowledge of the presence of the contraband substance. See Annot. 91 A.L.R.2d 810, 831 [85-91 A.L.R.2d LCS, p. 385]. In addition, no case has been found where the statute itself was held unconstitutional for failing to mention the requisite knowledge of the alleged possessor or his intention to possess.

"The statute prohibiting the possession of dangerous drugs is a product of a century old but accelerating tendency to call into existence new duties and crimes which disregard any ingredient of intent in the language of the law itself. Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1951). These are offenses of a regulatory nature. They do not fit neatly into any classifications of common-law offenses such as those against the state, the person or property. The original object of criminal law was to keep the peace and under strong church influence its function was extended to curb moral delinquencies. For these purposes it developed a suitable procedure, requiring proof of moral blame-worthiness or a criminal intent. But today the crowded conditions of life require social regulation to a degree never before attempted. The increased evil from dangerous drugs due to the complex conditions of modern life is just one area requiring new forms of regulation. With new drugs being discovered and introduced at an unprecedented rate, in addition to the existing drugs which have proven injurious to society, the people through their legislatures have demanded regulations upon their use. Section 53-133, R.C.M. 1947, is the kind of statute where evidence of the offender's specific intent would be difficult if not impossible to obtain and adequate enforcement of the law would be prevented if proof of this element was required. This Court does not mean to imply, however, that the state is relieved of the burden of showing that defendant knew the prohibited substance was in his possession. Such knowledge can be proved by evidence of acts, declarations, or conduct of the accused from which the inference may be drawn that he knew of the existence of the prohibited substance at the place where it was found. (Citing cases.)" (Emphasis supplied.)

From the foregoing discussion it is clear, without further comment, that (1) knowledge is an essential element of the criminal act, (2) knowledge can be proved by direct evidence, or (3) by evidence of acts, declarations, or conduct of the accused from which an inference of this knowledge may be drawn. The law does not imply knowledge from the fact of possession alone.

In this respect a fair reading of the last segment of the court's instruction No. 5 would seem to instruct the jury that the law does imply this knowledge from possession rather than an inference being drawn by circumstances surrounding the possession to prove knowledge, which circumstances would be a proper fact determination for the jury. This would make the instruction an incorrect statement of the law and confusing to the jury, which would entitle appellant to a new trial.

Appellant presents a secondary argument---the cause should be dismissed because there was no showing at all that the appellant had any knowledge of the dangerous drug character of the material he was selling and there was no proof of any facts from which such knowledge could reasonably be inferred.

We have examined the state's case and, without going into detail, find that there was evidence of acts, declarations, or conduct of the accused from which the jury could find an inference that the appellant knew of a prohibited substance, as the language was used in Glantz. Therefore, it is a matter for jury determination, under the proper instructions of the trial court.

The judgment is reversed and the cause remanded for a new trial.

_____
Associate Justice

- 8 -

We Concur:

_Chief Justice_

_Associate Justices_

Mr. Justice John Conway Harrison dissenting:

I dissent.

All of the provisions of the Montana Dangerous Drug Act of 1969, sections 54-129 through 54-138, R.C.M. 1947, became effective July 1, 1969, some five months before the sales involved here.

In support of his position defendant relies upon several previous cases of this Court. State v. Smith, 135 Mont. 18, 334 P.2d 1099 and State v. Hood, 89 Mont. 432, 436, 298 P. 354.

In Hood, a case involving possession of cocaine, police officers went into a room occupied by defendant Hood where they found cocaine in several places and a dictionary on which was printed "the Property of Samuel C. Hood". When the officers came into the room Hood rushed to the kitchen stove and threw something into the fire. Upon conviction for possession of cocaine, Hood appealed and this Court reversed the conviction because the state failed to show defendant had conscious possession of the prohibited substance. The Court said:

> "To justify a conviction of unlawful possession
> of a prohibited article there must be proof of
> actual control and management of the thing pro-
> hibited."

- 9 -

Hood, a possession case and not a <u>sale case</u>, is cited in a recent opinion of this Court, State ex rel. Glantz v. District Court, 154 Mont. 132, 461 P.2d 193. <u>Glantz</u> involved an original proceeding before this Court in which an order to show cause was issued, and one of the issues considered was the constitutionality of the 1969 Montana Dangerous Drug Act. This Court found the Act constitutional. (See majority Opinion).

It is obvious from the cited portion of <u>Glantz</u> in the majority Opinion that even though the statute does not specifically require that possession be knowingly, knowledge is an essential element of a possession charge. The same rationale applied to possession cases must be applied where a sale is involved.

Here, possession was firmly established by defendant's own testimony. In State v. Trowbridge, _____ Mont. _____, 487 P.2d 530, 532, 28 St. Rep. 693, this Court, citing from a Colorado case, Petty v. People, 167 Colo. 240, 447 P.2d 217, said:

> "'However, a conviction for possession may be predicated upon circumstantial evidence. Mickens v. People, 148 Colo. 237, 365 P.2d 679. A conviction of illegal possession may be based upon evidence that the marijuana, while not found on the person of the defendant, was in a place under his dominion and control. [Citing cases] If possession is established, knowledge of the character of the drug and the fact that it is possessed can be inferred therefrom.'"

Here, we have a doctor of osteopathy who had practiced his profession some 46 years. He testified that in the brown bottle of pills given him by Dr. Lindeberg there were quite a few tranquilizers and diet pills. He had given some of these tranquilizers to an individual at the county rest home. To believe that an osteopathic doctor with the above number of years of practice would make this argument and expect a jury to believe it, is beyond comprehension.

- 10 -

In a recent opinion of this Court, the first concerning the sale of dangerous drugs under the 1969 Montana Dangerous Drug Act, this Court considered both sections 54-131 and 54-132, R.C.M. 1947, of that Act. In State v. Karathanos, ____Mont.____, 493 P.2d 326, 29 St.Rep. 81, defendant was found guilty of a sale where he was in lawful possession of the drugs. In that case, as here, defendant had no license to sell and did not come within the exceptions noted in section 54-131, R.C.M. 1947. I believe Karathanos is controlling here.

I would affirm the decision of the district court.

_____
Associate Justice.