No. 89-46

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

---

STATE OF MONTANA,

        Plaintiff and Respondent,

  -vs-

KYONG CHA KIM,

        Defendant and Appellant.

---

APPEAL FROM:  District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable Jack L. Green, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Joseph M. Goldman and Michael F. Bailey; Goldman Law
Offices, Missoula, Montana

    For Respondent:

        Hon. Marc Racicot, Attorney General, Helena, Montana
Kathy Seeley, Asst. Atty. General, Helena
Robert L. Deschamps, III, County Attorney, Missoula,
Montana

---

Submitted on Briefs:  June 30, 1989

Decided:  September 18, 1989

Filed:

                   Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

Kyong Cha Kim was convicted by jury of prostitution, a misdemeanor, and promoting prostitution, a misdemeanor, in the Fourth Judicial District Court, Missoula, Montana. Ms. Kim was sentenced to six months on each count, to be served in the Missoula County Jail, the sentences to be served consecutively. Both sentences were suspended. Ms. Kim was also fined $500 on each count. From these convictions, Ms. Kim appeals. We affirm.

1. Did the District Court err in denying defendant's motion to dismiss based on entrapment?

2. Did the District Court err in denying defendant's motion to suppress certain evidence obtained through a consent to search warrant?

In the fall of 1987, Ms. Kim moved to Missoula, Montana, where she opened a sauna massage business named the Crossroads Sauna. Shortly after the business opened the Missoula County Attorney's office began receiving complaints about prostitution at the business.

In October 1987, the county attorney's office began an investigation into the activities of the Crossroads Sauna. Initially, on October 21, 1987, two detectives, posing as truck drivers, went to the sauna. A female employee of the sauna showed them the facilities and explained that the sauna offered a $40, $60 and $100 massage. Both officers testified that when they asked what the $100 massage included, they were told it included "everything." The detectives did not request a massage during that visit. They returned on November 10, 1987, and on this visit they spoke directly to Ms. Kim who told them only the $100 massage was available. However, when the officers refused to pay $100, Ms. Kim said they could receive the $40 massage. Both detectives were

2

then asked to sign a form acknowledging that they would not give anything of value for any sexual conduct. The detectives testified that the $40 massage consisted of a sauna, a shower, and a back rub by Ms. Kim and another employee.

During that same visit the two detectives asked Ms. Kim about holding a bachelor party for a friend at the Crossroads Sauna. Ms. Kim agreed to the party. She stated, however, that each member of the party must receive the $100 massage. When the detectives asked her what this included she said it included "everything," and that she would teach the groom how to make love to his new wife.

On November 19, 1987, six deputies and a deputy county attorney arrived at the Crossroads Sauna for the purported bachelor party. They brought beer with them and on the way there each had consumed a beer or less in order to appear to be partying. One officer carried a gun. Ms. Kim and two female employees admitted the officers. A fourth woman was on the premises but never became involved with the party.

The men were escorted to a room where the groom was given a bottle of champagne, and seated on a chair. The officers testified that the two employees sat on his lap and began to unbutton his shirt and take off his belt. An officer and the deputy county attorney then began talking to Ms. Kim outside the room. Conflicting testimony was presented as to who initiated conversation about sexual intercourse, however, the officers testified that when they asked Ms. Kim about protection, she assured the officers that she had "rubbers." The negotiations ended with an agreement that for the $100 each, the groom would have sex with all three women, and the other members of the party would each have sex once. The officers testified that this conversation was carried on in a quiet and businesslike manner.

3

After this conversation, Ms. Kim was arrested and handcuffed, as were the two employees. They were given Miranda rights. While one employee became very upset and had to be physically subdued, the officers testified that Ms. Kim and the other employee were cooperative and composed. Ms. Kim was asked if she would sign a consent form, allowing the officers to search the premises. She agreed to sign the form and a search was conducted. During the search Ms. Kim showed the officers where boxes of condoms were stored in her freezer. A later count revealed that this supply included 334 condoms. Ms. Kim entered pleas of not guilty to prostitution and promoting prostitution.

Ms. Kim was tried by jury in Justice Court on May 26, 1988, and a verdict of guilty was returned on both counts. Ms. Kim then appealed to District Court. She moved for dismissal, alleging the affirmative defense of entrapment. She also moved to suppress the evidence seized during the search. The hearing on these motions was held on September 29-30, 1988, and the court denied both motions. Ms. Kim was tried by jury on October 26-28, 1988, and the jury returned a verdict of guilty on each count.

I

Did the District Court err in denying defendant's motion to dismiss based on entrapment?

As a pretrial motion, Ms. Kim moved to dismiss the charges against her based on the affirmative defense of entrapment. The court's hearing on this motion included testimony from numerous witnesses, including Ms. Kim and her employees, and witnesses for the State. The court denied this motion.

Initially, the State contends that the defense of entrapment is not available to a defendant who denies

4

committing the acts for which she is charged, citing State v. Kamrud (1980), 188 Mont. 100, 103-04, 611 P.2d 188, 190. See also State v. O'Donnell (1960), 138 Mont. 123, 354 P.2d 1105; State v. Parr (1955), 129 Mont. 175, 283 P.2d 1086. In the present case, Ms. Kim pled not guilty to both the charge of prostitution and the charge of promoting prostitution. Thus, the State contends that Ms. Kim was not entitled to assert this defense. However, because the District Court heard testimony on this motion we will review the defense on its merits.

Entrapment is an affirmative defense available to a criminal defendant, and is codified in § 45-2-213, MCA, as follows:

> A person is not guilty of an offense if his conduct is incited or induced by a public servant or his agent for the purpose of obtaining evidence for the prosecution of such person. However, this section is inapplicable if a public servant or his agent merely affords to such person the opportunity or facility for committing an offense in furtherance of criminal purpose which such person has originated.

The elements of this defense were further explained by this Court in State v. Hanley (1980), 186 Mont. 410, 414, 608 P.2d 104, 106, wherein we enumerated the elements of entrapment as follows:

> (1) criminal intent or design originating in the mind of the police officer or informer; (2) absence of criminal intent or design originating in the mind of the accused; (3) luring or inducing the accused into committing a crime he had no intention of committing. See State v. Grenfell (1977), 172 Mont. 345, 564 P.2d 171; State ex rel. Hamlin v. District Court (1973), 163 Mont. 16, 515 P.2d 74; State v. Karathanos, supra.

5

The burden of establishing entrapment rests on the defendant. A court may determine that entrapment exists as a matter of law. Kamrud, 611 P.2d at 191; State v. Grenfell (1977), 172 Mont. 345, 564 P.2d 171. However, if there are conflicting facts, the issue is properly submitted to a jury. State v. McClure (1983), 659 P.2d 278, 280, 202 Mont. 500, 503. Additionally, in reviewing the denial of a motion to dismiss based on entrapment, this Court will view the evidence and inferences in a light most favorable to the State. State v. Merrill (Wash.App. 1979), 597 P.2d 446.

Ms. Kim contends that entrapment was established as a matter of law, requiring dismissal of the charges. Ms. Kim contends that the criminal intent originated in the minds of the law enforcement officers, that she had no intent herself to commit the crime, and that she was induced to commit the crime. Ms. Kim relies on the cases of Kamrud and Grenfell in support of her contention. Having reviewed the evidence and the elements of this defense, we conclude that entrapment did not exist as a matter of law.

At the hearing, the officers testified that on the evening of the party, two of the women employees sat on the lap of the "groom," and began to unbutton his shirt and undo his belt buckle. No testimony suggested that these women were induced to begin these actions. Additionally, the testimony by law enforcement personnel indicated that Ms. Kim did not have to be induced to participate in discussions about sexual intercourse for pay. Instead, their testimony emphasized that Ms. Kim was totally agreeable to negotiations regarding sex, and that she was prepared to supply "protection" in the form of condoms. In response, Ms. Kim denied that she agreed to provide sex. She testified that she was supposed to "tease" the "groom," and that any references to sexual acts was all a part of the joke. This evidence

regarding the defense of entrapment was properly submitted to the jury.

Ms. Kim relies on this Court's decisions in Kamrud and Grenfell to support her contention that the court should have found entrapment as a matter of law. These cases are distinguishable in several respects, however.

In Grenfell an informant became a friend of the defendant over a period of six months and "persistently requested" help from the defendant in procuring drugs. In concluding that entrapment had occurred, this Court stated, "The record shows Grenfell was not predisposed to commit this offense." Grenfell, 564 P.2d at 173.

In Kamrud, law enforcement officers induced the defendant to obtain drugs for them. As inducement to commit the crime, the officers used marijuana themselves in the presence of defendant, they became friendly and held parties to ingratiate themselves with defendant. There was no evidence that Mr. Kamrud had sold drugs in the past, or that the idea of selling the drugs originated with Mr. Kamrud. In Kamrud the officers violated the law themselves by using and giving away marijuana. In concluding that entrapment was established as a matter of law, this Court stated:

> "In short, there is a controlling distinction between inducing a person to do an unlawful act and setting a trap to catch him in the execution of a criminal design of his own conception . . ." State v. Karathanos (1972), 158 Mont. 461, 493 P.2d 326, 331. . ."

Kamrud, 611 P.2d at 191.

Comparing the present case to the facts of Kamrud and Grenfell, this controlling distinction is apparent. This is not a case where there was no suggestion of criminal activity prior to the investigation. The investigation was initiated

7

because of citizen complaints. In the present case the law enforcement officers set a trap. However, the evidence, including the testimony of the officers, and the large supply of condoms, indicated that Ms. Kim did not have to be induced to participate in discussions about sexual intercourse. There was substantial credible evidence to support a finding that criminal intent originated with Ms. Kim. Understandably, the District Court refused to find that as a matter of law Ms. Kim lacked criminal intent, or was induced to commit the crime. These determinations were properly left for the jury. We affirm the District Court's denial of Ms. Kim's motion to dismiss.

## II.

Did the District Court err in denying defendant's motion to suppress certain evidence obtained through a consent to search warrant?

Immediately following her arrest, Ms. Kim signed a consent to search which allowed the officers to search the Crossroads Sauna. Ms. Kim claims that her consent was not voluntary under the totality of the circumstances, citing Schneckloth v. Bustamonte (1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854. She contends that the court erred in denying her motion to suppress evidence obtained as a result of this search. At the hearing on this motion the District Court heard testimony about how the consent was obtained, and other relevant evidence. The court denied Ms. Kim's motion to suppress.

The right to be free of an unreasonable search and seizure is guaranteed by the Fourth Amendment to the United States Constitution, and is made applicable to the states through the Fourteenth Amendment. One may however, consent to a search as long as that consent is proved by clear and

8

convincing testimony and as long as it is established that the consent was not coerced. The State has the burden of showing that the consent was voluntary. Voluntariness is a factual issue and is determined from the totality of the circumstances. Schneckloth, 412 U.S. at 248-49.

On appeal, our standard of review when considering a court's ruling on a motion to suppress, is whether the record contains substantial credible evidence to support the district court's findings, and whether those findings were applied correctly as a matter of law. State v. Beach (1985), 217 Mont. 132, 147, 705 P.2d 94, 103. "The credibility of the witnesses at a suppression hearing is properly determined by the trial court that heard testimony and observed the witnesses." The trial court is the finder of fact in a suppression hearing. State v. Kirkaldie (1978), 179 Mont. 283, 289-90, 587 P.2d 1298, 1302-03.

Ms. Kim urges that her consent was not voluntary for the following reasons. She emphasizes that she was hand-cuffed and in the custody of seven male law enforcement officers. She notes that she is only five feet tall, and weighs only 100 pounds. She alleges that she was intimidated because one of her employees had to be physically subdued. Ms. Kim alleges that the officers threatened to "tear the place apart" if she did not sign the consent form. She alleges that one of the officers pointed a gun at one of her employees. Ms. Kim also claims her Korean descent and lack of familiarity with American processes made her vulnerable to the officers' requests.

Ms. Kim signed the form approximately twenty-five minutes after she was arrested and approximately fifteen minutes after she witnessed the scuffle with her employee. At the time she signed, her handcuffs had been removed, and she was seated, drinking a pop and smoking. The officers

testified that they read the form to Ms. Kim twice and that she also read it herself. The officers denied making any threats about "tearing the place apart." Only one officer was carrying a gun, and he testified that he held the gun at his side for less than a minute while the arrests were being made, then put it away. He testified that he never pointed it at anyone.

While custody is a factor in the totality of the circumstances test, it does not necessarily negate consent. State ex rel. Kotwicki v. District Court (1975), 166 Mont. 335, 344, 532 P.2d 694, 699. Additionally, Ms. Kim's background belies her contention that she lacked understanding of the proceedings. Testimony at the hearing established that Ms. Kim is an American citizen who has owned several businesses in America. In the past she has worked with sheriff and police departments as an interpreter. She has also worked as an interpreter in courtrooms and in jails.

The court had the opportunity to hear the witnesses, judge credibility, and weigh the evidence. The court determined that under the totality of the circumstances, the State's evidence was clear and convincing that Ms. Kim's consent was obtained voluntarily.

Ms. Kim also contends that the scope of the search exceeded the scope of the consent. She claims that the kitchen and office were not included in her consent. There is no merit to this claim because the consent form clearly authorized a search of Ms. Kim's "Premise Business located at Crossroads Sauna/Wye." Additionally, one officer testified at the hearing that he explained to Ms. Kim that "every room in the entire establishment would be searched." Ms. Kim herself then directed the officers to the kitchen and showed them where the condoms were stored. We affirm the District Court's denial of Ms. Kim's motion to suppress.

Affirmed.

We Concur:

_J. A. Turnage_
Chief Justice

_John Conway Harrison_

_L. C. Gulbrandson_ .

Justices

_Justice_

11

Mr. Justice John C. Sheehy, dissenting:

In my opinion, this case involves an entrapment and therefore the convictions ought not to stand.

On October 21, 1987, a captain of the Missoula County Sheriff's Department directed two of his officers to visit Kim's business premises and to investigate any possible illegal activities being conducted thereon. The officers went to the business in the guise of truck drivers, and were then given a tour by the defendant of her business premises. The men left the business, saying they would return at a later date. They reported to the Captain that they observed nothing while on the premises to indicate any illegal or immoral activity being conducted by the defendant or her employees.

While they were at the premises on October 21, 1987, they discussed with Kim the services available at her business. She explained to them there were three types of services, for $40, $60 and $100, based on the length and thoroughness of the massage and sauna. Kim explained that the $100 massage and sauna included "everything." What "everything" means is apparently in the ear of the beholder. To Kim it meant everything related to massage and sauna. To the officers, "everything" meant some sort of sexual favors, although no discussion of sexual favors occurred at that time.

On October 22, 1987, the Captain initiated a thorough investigation of Kim's background. The Captain spoke to a Missoulian reporter who reported that he and a newspaper photographer had gone undercover to Kim's business in search of a possible story, and had both purchased and received massages. Neither of them had been offered sex by the

defendant in exchange for compensation nor had either observed any immoral or illegal activity.

On October 22, 1987, the Captain telephoned officers in Seattle, Washington. Here it was reported to the Captain that there was no record of the defendant having ever been suspected of the charges of any offense during the years she resided and worked in the Seattle area.

The Captain checked the licensing authorities in the state to determine whether she had a proper business license. He found nothing in discord. He also requested of the Federal Immigration and Naturalization Service a thorough search of the records and status of all Koreans in the state of Montana with special emphasis on the defendant's records and status. That report came back negative. He inquired of the owners of the premises that she was leasing. They advised that they had investigated her reputation and found nothing against her. The Captain investigated her motor vehicle records and found nothing in connection of her operation of an automobile.

On November 10, 1987, the Captain required his two undercover officers again to visit Kim's premises. They were instructed to pay for a $40 massage and sauna. The massages were administered only after each officer signed an acknowledgement that no sex would be offered or demanded. After the massages, the officers returned to the front of the business establishment and talked to Kim. There they told her that they wanted to have a bachelor party for seven or eight friends at her place of business. She agreed to reserve the premises for their bachelor party. Her understanding was that the purpose was to tease the prospective groom as a part of the bachelor party.

Thus the idea for the bachelor party originated in the minds of the investigating officers. The proposal was not

one that would be a part of Kim's regular business. Following the second account, the officers again reported to their Captain that they had observed no illegal or immoral activity being conducted on Kim's premises.

On November 19, 1987, six Missoula County Deputy Sheriffs and one Deputy County Attorney, arrived at the premises for the pre-arranged bachelor party. They had consumed alcohol prior to entering "to give the appearance of being on a party." They all engaged in teasing the groom about his upcoming marriage. The only activity that hints of sexuality is that one of the woman unbuttoned the groom's shirt and attempted to remove his belt. While it was the officers who were saying to the prospective groom that they were going to have him "laid" before his marriage, it was then that the officers took Kim aside, and negotiated a proposal for sexual favors. She was placed under arrest. No money changed hands. No sexual activity of any kind ensued.

Under State v. Kamrud (1980), 188 Mont. 100, 611 P.2d 188, this was entrapment pure and simple.

1. The criminal design to solicit (this is a solicitation case) sexual activity did not originate with Kim but with the undercover officers.

2. The officers did more than merely afford Kim with the opportunity to commit the offense, they first committed the offense themselves.

3. They set up the situation by first ingratiating themselves with her even though they found no evidence of any criminal activity in connection with her business.

4. The investigation of her background and the undercover investigations gave no evidence that she was predisposed to commit any offense or that the idea originated with her.

There is no evidence that when on the second visit they proposed a bachelor party that the bachelor party would include prostitution. If that had occurred, they would have so reported to their supervising officer.

The whole mess is a dirty business, but it originated in the Sheriff's Department.

_____
Justice

Mr. Justice William E. Hunt concurs with the dissent

of Mr. Justice John C. Sheehy.

_____
Justice

Mr. Justice R. C. McDonough concurs with the foregoing dissent.

_____
Justice

- 15 -