No. 14807

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

STATE OF MONTANA,

              Plaintiff and Respondent,

    vs.

ERNEST C. HANLEY,

              Defendant and Appellant.

Appeal from:  District Court of the Thirteenth Judicial District,
               Honorable Charles Luedke, Judge presiding.

Counsel of Record:

    For Appellant:

        Richter and Lerner, Billings, Montana
        Alan Lerner argued, Billings, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, argued, Helena, Montana
        Richard Larson appeared, Assistant Attorney General,
         Helena, Montana
        Harold Hanser, County Attorney, argued, Billings, Montana

Submitted:  January 21, 1980

Decided: MAR 1 3 1980

Filed: MAR 13 1980

_Thomas J. Kearney_
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

On November 20, 1979, this Court issued an opinion suppressing all evidence against the defendant and reversing his conviction. A petition for rehearing was filed on November 30, 1979, was answered by objections on December 3, 1979, and on December 21, 1979, this Court ordered a rehearing. The case was reheard on oral argument before this Court on January 21, 1980, from which this opinion follows.

Defendant Hanley appeals from his conviction on a felony charge of sale of dangerous drugs. Trial was held in the District Court, Yellowstone County.

While on parole as a result of a previous drug conviction, defendant was arrested and placed in the Yellowstone County jail. The arrest came as a result of a complaint by his wife. Shortly after his incarceration, defendant requested a meeting with detectives from the Yellowstone County Criminal Investigation Division (C.I.D.).

Two detectives responded to defendant's request. At the meeting, defendant informed the detectives that he wanted to become an informer to stop his wife's involvement in the Billings drug scene. As an expression of sincerity, he provided the names of several individuals who were involved in drug-related activities. The C.I.D. approved defendant's request to become an informant. The detectives instructed defendant to infiltrate a large drug ring in Billings and gain information for setting up a large buy of drugs.

There was conflicting testimony as to the specifics of defendant's scope of authority as an informant. Defendant testified that the detectives told him to do what he had to

do, (to do anything necessary), to infiltrate these drug rings and establish a large buy. In defendant's mind this included making purchases and sales of small amounts of drugs. The detectives, however, testified that defendant's role as an informant was simply to gain information concerning drug activities and that C.I.D. personnel would buy the drugs once a purchase had been arranged. Detective Ford testified that defendant was asked only to provide information, not to participate in drug transactions. Shortly after defendant agreed to become an informant, he was released from jail.

After his release, defendant became involved in a purchase and sale of drugs on January 2, 1979. Three men, Ron Wiley, Colin Wilson, and defendant, arranged to sell a quantity of methamphetamine to Tony Carrier, an undercover agent working for the C.I.D. At approximately 8:00 a.m. on January 2, 1979, Carrier received a call from Wiley, with whom Carrier had dealt before, and was told there was a quantity of methamphetamine for sale. Defendant's participation in the phone call was primarily to inform Carrier of the quality of methamphetamine, otherwise known as "crank," which was available. Carrier arranged to purchase the drugs from the three men at a meeting later that day at Sambo's, a Billings restaurant. Carrier recorded the telephone conversation without a search warrant by means of a device attached to his phone.

Prior to the meeting, Carrier contacted the C.I.D., which applied to the District Court for an order or search warrant to electronically monitor the sale. The District Court granted the order, and Carrier was fitted with an electronic monitoring device.

Carrier later met defendant and the other two men at Sambo's. Two plain clothes officers were observed by the men in the restaurant, however, and the meeting was transferred to defendant's residence where the details of the purchase were discussed. Carrier agreed to buy two grams of methamphetamine for approximately $65 per gram. Defendant and Carrier then left for another residence where defendant purchased and picked up the drugs. Defendant gave Carrier two small packages of methamphetamine and took a small portion of one of the packages as his "cut." Carrier then drove defendant to his residence, returned to the C.I.D. office and turned in the packages for analysis. The state crime laboratory tested the substance in the packages and confirmed that it was methamphetamine.

On January 19, 1979, defendant was arrested for the criminal sale of dangerous drugs. Prior to his arrest, defendant made no effort to contact officers regarding the sale. Defendant appeared with counsel on January 24, 1979, and entered a plea of not guilty. On March 7, 1979, defendant moved to suppress all evidence on the grounds of constitutional infringement of his right to privacy. The motion related to the electronic monitoring of conversations of the sale of drugs. The District Court denied the motion to suppress on March 8, 1979, and trial began on that day. At trial the State introduced the tape of the events of the sale as well as the drugs seized in the sale. Defendant was convicted on March 9, 1979, and sentenced to ten years in the Montana State Prison with five years suspended.

Defendant-appellant presents the following issues for review by this Court:

1. Was the defendant entrapped into committing the offense for which he was convicted?

2. Did the District Court err in denying defense counsel's motion to suppress State's exhibits 2, 3 and 4?

3. Did the District Court err in granting the State's motion in limine preventing inquiry into Carrier's criminal record when such inquiry would have allowed a determination of whether Carrier was a duly appointed official authorized to wiretap under Montana statutes?

Appellant's first issue is directed to the charge of police entrapment. Appellant rests his defense on previous cases of this Court: State v. Neely (1931), 90 Mont. 199, 300 P. 561; State v. Harney (1972), 160 Mont. 55, 499 P.2d 802; State v. Karathanos (1972), 158 Mont. 461, 493 P.2d 326.

The defense of entrapment is set forth in section 45-2-213, MCA, which reads:

"A person is not guilty of an offense if his conduct is incited or induced by a public servant or his agent for the purpose of obtaining evidence for the prosecution of such person. However, this section is inapplicable if a public servant or his agent merely affords to such person the opportunity or facility for committing an offense in furtherance of criminal purpose which such person has originated."

We note the Commission comment to the above-quoted section states that:

"An entrapment defense is composed of three elements: (1) the idea of committing an offense originates with the authorities, not the suspect; (2) the authoritites actively engage the suspect to commit the offense, and (3) such encouragement is designed to obtain evidence for the suspect's prosecution."

Montana law provides: (1) criminal intent or design originating in the mind of the police officer or informer; (2) absence of criminal intent or design originating in the mind

-5-

of the accused; and (3) luring or inducing the accused into committing a crime he had no intention of committing. See State v. Grenfell (1977), 172 Mont. 345, 564 P.2d 171; State ex rel. Hamlin v. District Court (1973), 163 Mont. 16, 515 P.2d 74; State v. Karathanos, supra.

We find very little factual similarity between Grenfell and the present case. There was an informant in each case, but they played strikingly different roles. In Grenfell the informant instigated the transaction by means of repeated entreaties to the defendant. In the present case, the informant did not initiate the transaction; the sellers did. Here appellant did not even contact the law enforcement authorities, Wiley did.

In Grenfell the informant arranged the transaction to obtain evidence for the defendant's prosecution. Here, the informant was involved in a wide-ranging undercover investigation. He knew Wiley was a dealer; he did not know appellant.

Here, appellant was not the target of the informant's activities; he was caught up in those activities. However, as this Court stated in Karathanos, 158 Mont. at 470, 493 P.2d at 331:

> ". . . there is a controlling distinction between inducing a person to do an unlawful act and setting a trap to catch him in the execution of a criminal design of his own conception. The fact that the Yellowstone County Sheriff's Office afforded the opportunity or the facility for the commission of the offense, does not come within the entrapment rule."

To the same effect, see Harney, supra, and State ex rel. Hamlin, supra.

The informant did not induce appellant to sell him the drugs; any inducement would have to be attributed to another

-6-

person or persons. While appellant blames the C.I.D. detectives, for whom there is no counterpart in Grenfell, any similarities between the two cases end  there.

To establish entrapment by the C.I.D., appellant must first show that the criminal intent originated in the minds of the authorities. Accepting for argument purposes appellant's version of what the detectives told him, at the most appellant was told to do what he had to do to make a big buy. Such a request would not include authorization to make a substantial sale as appellant did here.

The intent of the detectives, according to their testimony, was to utilize appellant as an informant and hopefully get one of their men into the drug scene undercover with appellant's help. Their testimony, if believed by the jury, was more than adequate to show that appellant was given a clear set of instructions limiting his role in their operation. To the extent that he went beyond those directions in becoming involved in the drug sale for which he was arrested, appellant was acting on his own.

Appellant acted with an independent intent, evidenced by his conduct before, during and after the sale. Appellant had learned of a drug source and a purchaser, but he did not contact the C.I.D. He knew of the arrangements for a noon meeting at Sambo's but did not contact the C.I.D. Upon seeing two C.I.D. detectives at Sambo's, appellant insisted upon moving the meeting to his home. He admits that he did nothing more than to nod to one of the officers; he did not communicate with them in any meaningful manner. After the sale when he was home alone, appellant had an opportunity to contact the C.I.D. without fear of being exposed as an

informant.  He did nothing.  For the following nine days, until he was arrested, appellant made no effort to contact the C.I.D. in any way.  The day before he was arrested appellant spoke with his parole officer and was asked what he was doing for the authorities.  Even at that time, he said nothing.

Appellant's behavior is plainly inconsistent with his claim that he considered himself a C.I.D. operative and participated in the drug sale for that reason alone.  Appellant's explanation for his behavior, that he felt he was being used by the C.I.D. and wanted nothing to do with the drug, fails to address the other facts which were brought out in the testimony at trial.  For example, when appellant gave the drugs to the informer, Carrier, appellant took a "cut" out of one of the packets containing the drugs, stating in effect that that portion was his compensation for setting up the sale.  Carrier testified that appellant placed his finger on his nose and "sniffed" or inhaled when he took his cut.  Appellant admitted that he had taken a small portion of the drugs for his own use in the manner Carrier described.

Taken as a whole, the picture painted for the jury shows an opportunistic appellant who was willing to exploit his drug scene connections as it suited him.  He was willing to provide certain information to the authorities, receiving nothing in return.  He was also willing to make a drug sale to someone he did not know and to conceal his involvement from the authorities whom he had agreed to help.  There is no evidence that his intent to sell the drugs originated in the minds of the C.I.D. detectives.  There is no evidence that appellant did not originate the intent to sell the

drugs himself. And further, there is no evidence that appellant was lured or induced to commit a crime he had no intention of committing. On this basis, he cannot establish entrapment on the facts presented to the jury.

Next appellant alleges that the evidence should have been suppressed as to the tape of the conversations at Sambo's; that the drugs seized were a result of the January 2, 1979 incident; and that any testimony or reports dealing with the drugs or conversations obtained by electric surveillance should be suppressed.

The testimony reveals that appellant participated only in a portion of the telephone conversations involved herein. Wiley placed the calls. However, Carrier spoke with Wiley, Wilson and appellant individually. Wiley quoted prices for the drugs, and appellant testified that he spoke with Carrier for five minutes, two minutes, or "briefly." Appellant testified it was Wilson, not appellant, who arranged the meeting at Sambo's, and that appellant did not discuss the price of drugs with Carrier. Carrier's testimony indicated that appellant's portion of the conversation dealt with the quality of the drugs which were available. Appellant could not recall whether he discussed the quality of the drugs during his conversation with Carrier.

The record indicates that Carrier recorded the telephone call made to him by Wiley, Wilson and appellant on January 2, 1979. Carrier was informed during that conversation that the callers could supply him with a supply of drugs for a certain price, and that he could meet them later that day at Sambo's to close the deal. The tape of that call was not introduced as evidence. The prosecution handed the tape to Detective Brennen during direct examina-

tion, but it was not introduced into evidence. The record indicates that the prosecution meant to refer to the tape of a monitoring which had been begun after Carrier left the appellant and others.

Defense counsel had objected to the telephone call tape because at the time it was made there was no request for a court order authorizing such a recording. That objection was sustained by the trial court. Later in the trial the prosecution offered to play the tape for appellant to refresh his memory while he testified. Defense counsel objected, and the court denied the prosecution's request.

Appellant argues that because the call was recorded without authorization and without the caller's knowledge, all evidence against him was tainted and should have been suppressed pursuant to the doctrine of "the fruits of the poisoned tree." The purported factual basis for this contention is stated as "the police found out about the illegal drug transaction/which the defendant was purportedly involved due to an illegal recording of Carrier's phone conversations with the appellant."

If that statement were true, if the police had relied on the recorded tape of the telephone conversation to obtain evidence against appellant, the argument could be made that such evidence should have been suppressed; however, that statement is false. The facts are that Carrier recorded a conversation that was wholly incidental to and did not affect the admissibility of evidence presented at trial. Carrier himself told the C.I.D. contacts of the pending drug transaction, first in a telephone call and then in person. One of the police officers with whom he spoke, Detective Brennen, testified that he learned of the transaction when Carrier called him.

This Court in State v. Brackman (1978), ___ Mont. ___, 582 P.2d 1216, 35 St.Rep. 1103, ruled that tape recordings and transcripts obtained through the use of an unauthorized electronic monitoring device were properly suppressed on constitutional grounds. Later in State v. Jackson (1979), ___ Mont. ___, 589 P.2d 1009, 36 St.Rep. 169, this Court unanimously held that Brackman was inapplicable where, as in this case, the State does not introduce or attempt to introduce evidence obtained through the use of an unauthorized electronic surveillance unit. We find Jackson to be controlling on the facts of this case. Wiley and Wilson gave Carrier most of the information concerning the proposed drug sale during the telephone conversation, including the quantity available, its price and the location of the meeting. This information, without appellant's discussion of the quality of the drugs, led to Carrier's monitored participation in the transaction and his purchase of the drugs which were introduced at trial.

In alleging that the recording of the conversation tainted all evidence, appellant relied on and invokes Wiley's and Wilson's privacy rights rather than his own. Here, appellant lacks standing to do so, and he cannot assert another's constitutional right. See State v. Smith (1975), 168 Mont. 93, 99, 541 P.2d 351, 354; State v. Braden (1973), 163 Mont. 124, 127, 515 P.2d 692, 694.

The next issue raised is whether the federal statutes prohibit the monitoring and tape recording of a conversation in which one of the participants consents to the monitoring and the recording. Appellant argues that the interception of oral communications was not authorized pursuant to 18 U.S.C. §§2516 and 2518 in this case.

The general rule is that it is impermissible for police officers to intercept, transmit or record private conversations; however, if one of the parties to the conversation consents, even an informer, such actions are legal. People v. Patrick (Mich. 1973), 208 N.W.2d 604; United States v. Mendoza (U.S.C.A. 5th, 1978), 574 F.2d 1373 rehearing denied 579 F.2d 644. This is true as long as the will of the consenting party has not been subjected to overbearing pressure from the authorities. United States v. Baynes (Pa. 1975), 400 F.Supp. 285, aff'd. 517 F.2d 1399. The sections relied on by the appellant, 18 U.S.C. §§2516 and 2518, do not apply here because they are part of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§2510 through 2520. That act does not pertain to, prohibit or regulate monitoring and recording conversations with the consent of one of the parties to the conversation. Section 2511(2)(c) provides:

"It shall not be unlawful under this chapter
for a person acting under color of law to
intercept a wire or oral communication, where
such person is a party to the communication
or one of the parties to the communication
has given prior consent to such interception."

The reasons for allowing police officials to monitor and record conversations where one of the parties consents is set forth in United States v. White (1970), 401 U.S. 745, 751, 91 S.Ct. 1122, 1125-26, 28 L.Ed.2d 453, 458, wherein the United States Supreme Court stated:

"Concededly a police agent who conceals his
police connections may write down for official
use his conversations with a defendant and
testify concerning them, without a warrant
authorizing his encounters with the defendant
and without otherwise violating the latter's
Fourth Amendment rights. Hoffa v. United
States, 385 U.S. at 300-303. For constitu-
tional purposes, no different result is re-

quired if the agent instead of immediately
reporting and transcribing his conversations
with defendant, he either (1) simultaneously
records them with electronic equipment which
he is carrying on his person.  Lopez v. United
States, 373 U.S. 427 (1963); (2) or carries
radio equipment which simultaneously transmits
the conversations either to recording equip-
ment located elsewhere or to other agents
monitoring the transmitting frequency.  (Citing
a case.)  If the conduct and revelations of an
agent operating without electronic equipment do
not invade the defendant's constitutionally jus-
tifiable expectations of privacy, neither does
a simultaneous recording of the same conversa-
tions made by the agent or by others from trans-
missions received from the agent to whom the
defendant is talking and whose trustworthiness
the defendant necessarily risks."

The attorney general informs us that county attorneys

in this state, since our decision in State v. Brackman,

supra, follow the practice of getting a court order allowing

electronic interception or monitoring of criminal suspects

before the same is undertaken.  We agree with this proce-

dure.  Moreover, our decision in Brackman is in accord with

what we have quoted from United States v. White, supra,

where, as this Court held, there was a constitutionally

justifiable expectation of privacy on the part of Brackman.

Since the authorities here obtained the consent of the

District Court to the monitoring and recording of appel-

lant's conversation on the basis of a participant's consent,

and since appellant could have no reasonable expectation

that the person he was dealing with in this drug-related

matter was not in fact an informer, no interest legitimately

protected by the Fourth Amendment is involved (United States

v. White, 401 U.S. at 740), and the monitoring and recording

of the conversation was permissible even under state law.

Section 45-8-213(1)(c), MCA.

Once it is established that the tape recordings are permissible under federal and state law, even though they constituted an intercept of appellant's conversation, they are subject to the ordinary rules of admissibility. We said in State v. Brubaker (1978), ___ Mont. ____, 602 P.2d 974, 978, 36 St.Rep. 1915, 1919:

> "One should not be confused about the admissibility of evidence simply because it is electronically recorded or preserved. Such evidence is subject to the same tests for admissibility as the direct evidence of eyewitnesses or the testimony of listeners to oral statements. . . Then the tape recorded statements may be regarded as independent direct evidence or as corroborative evidence. In either case, the tests for admissibility are the same. Cape v. United States (9th Cir. 1960), 283 F.2d 430. In this case . . . it was merely direct evidence of statements made by the defendant . . . Since the [informer] could have testified directly to such statements . . . the recorded statements are themselves admissible. In fact, the tape is a more reliable record than the oral testimony of the [informer] given the fraility of human recollection. We note here that a proper foundation for the admission of the tape was laid by the prosecution. Again, the question of admissibility of this type of evidence is left to the sound discretion of the trial judge. 29 Am.Jur.2d 495, Evidence, §436. No question is presented here as to the integrity of the recording, that is, regarding its recording quality or audibility." (Bracketed material inserted.)

The tape recordings therefore are not subject to suppression.

The drugs introduced into evidence did not derive from the monitoring and recording that occurred. The record indicates that the law enforcement officials obtained the drugs through an informant, not through monitoring and recording. The monitoring and recording were incidental to, not the cause of, the "seizure of the drugs". The informant was the independent source of the information concerning the transaction of the drugs themselves, and the fact that the

-14-

monitoring and recording occurred does not affect the admissibility of the evidence. In a recent case, State v. Ribera (1979), ____ Mont. ____, 597 P.2d 1164, 1169, 36 St.Rep. 1292, 1298-99, this Court recognized and discussed the question that must be answered when an illegal seizure is alleged--that is, whether the initial illegality was a cause in fact of the discovery of the evidence. In that case, we cited Wong Sun v. United States (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. Here the monitoring and recording was not a cause of the discovery of the evidence; therefore, the exclusionary rule does not apply even if the monitoring and recording were to be deemed unlawful. The drugs were properly admitted by the District Court.

The final issue is whether the District Court erred in granting the prosecution's motion in limine. Appellant argues that the District Court committed reversible error in prohibiting the defense's inquiry into Carrier's prior criminal behavior and his qualifications to be a Big Horn County Deputy Sheriff. Appellant contends these matters were relevant because the desired testimony would have established that Carrier could not legally serve as a deputy sheriff and, therefore, any interpretation on his part of a conversation would be a criminal act under section 45-8-213, MCA, which provides in relevant part:

> "(1) . . . a person commits the offense of violating privacy in communications if he knowingly or purposely:
>
> ". . .
>
> "(c) records or causes to be recorded any conversation by use of a hidden electronic or mechanical device which reproduces a human conversation without the knowledge of all parties to the conversation. Subsection (c) does not apply to duly elected or appointed

> public officials or employees when the transcription or recording is done in the performance of official duty, to persons speaking at public meetings, or to persons given warning of the recording."

Here, Carrier was a public employee, if not a public official, and his official duty involved maintaining contact with persons involved in the drug scene. By express terms of the statute, Carrier is an exempt person from the provisions of the act. See Brackman, supra.

In addition, it would appear that the evidence appellant sought to get before the jury--Carrier's conviction of a criminal offense--is prohibited under Rule 609, Mont.R.Evid. The District Court properly granted the motion to suppress.

Our first opinion in this cause, dated November 20, 1979, 36 St.Rep. 2027, is withdrawn, and this opinion substituted in its stead.

For the foregoing reasons, the judgment of the District Court is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

Mr. Justice Daniel J. Shea concurs, and will file a separate concurring opinion later.

-16-