No. 14747

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

RONALD LEE BASSETT,

Defendant and Appellant.

Appeal from: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Robert Wilson, Judge presiding.

Counsel of Record:

For Appellant:

Allen Beck argued, Billings, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Richard Larson argued, Assistant Attorney General,
Helena, Montana
Harold Hanser, County Attorney, Billings, Montana
James Walen argued, Deputy County Attorney, Billings,
Montana

Submitted:

Decided: JUL 2 5 1980

Filed: JUL 2 5 1980

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from defendant's convictions of two counts of criminal sale of dangerous drugs.

Defendant Ronald Lee Bassett was charged by information filed directly in the Yellowstone County District Court, on January 19, 1979, with two counts of selling cocaine, in violation of sections 45-9-101 and 50-32-101 through 50-32-313, MCA, and one count of possession of marijuana in violation of sections 45-9-102 and 50-32-101 through 50-32-313, MCA. The charges stemmed from a wide-ranging investigation of illegal drug activity in the Billings, Montana, area in which a Big Horn Deputy Sheriff, Atone R. (Tony) Carrier was "on loan" to Yellowstone County authorities working as an undercover investigator. In the investigation, the authorities routinely made use of electronic surveillance and monitoring devices. Carrier was outfitted with a concealed microphone and a transmitting device commonly known as a body monitor.

Carrier met with defendant on at least six occasions. On October 17, 1978, Carrier was introduced to defendant by Russell Bender. This introduction was made at Bender's residence. Carrier had purchased an automobile from Bender and had also made arrangements to buy a quantity of cocaine at Bender's residence. Outside the residence, Bender and defendant carried on a brief conversation which Carrier could not overhear. After Carrier gave Bender $80 in cash, defendant handed Bender a small packet. The three men proceeded into Bender's living quarters, where defendant brought a mirror. Bender placed a portion of the substance from the packet on the mirror and inhaled it. Carrier subsequently left, taking the packet with him.

Carrier proceeded to the Yellowstone County Courthouse where he turned the packet over to a detective with the county's Criminal Investigation Division (C.I.D.). The substance was field tested at the courthouse and showed positive for cocaine. Subsequent analysis at the state crime laboratory confirmed the substance purchased was cocaine.

Carrier met with defendant on October 18, 1978, and again on October 26, 1978. A fourth meeting took place on November 3, 1978, at which time defendant informed Carrier that he could get a quarter ounce of cocaine for $600. Arrangements were made for the sale. On November 7, 1978, Carrier purchased five packets of cocaine at defendant's residence. This purchase was made from defendant. Carrier delivered the packets to the C.I.D. offices, and subsequent analysis of the state crime laboratory confirmed that the packets contained cocaine. Carrier made a final contact with defendant on December 4, 1978.

During each of the contacts, Carrier was outfitted with a concealed microphone and body monitor. Carrier freely consented to the placement and the use of these devices. According to testimony presented at a suppression hearing, the devices were used to provide protection for Carrier and to enable officers to prepare accurate reports of the events. Court orders permitting the monitoring were obtained for Carrier's last three contacts with defendant but not for the first three.

After pleading not guilty to the charges, defendant filed various pretrial motions, including a "motion to suppress based on illegal electronic surveillance and/or eavesdropping." A hearing on defendant's motions was con-

ducted.  The trial court ruled that the tape recorded conversations monitored without prior authorization could not be admitted into evidence.  However, the court denied suppression of the tape recordings obtained with prior judicial authorization.  The court also granted an unrelated motion to suppress based upon an unlawful search warrant, and that ruling led to a dismissal of Count III of the information, the misdemeanor possession charge.

At trial the State introduced and the trial court admitted tape recordings of conversations on November 3, 1978, and November 7, 1978.  No attempt was made to introduce any other tape recordings at trial.  The State also introduced into evidence drugs seized in the sale transactions of October 17 and November 7.  The jury returned guilty verdicts as to the two remaining counts.  The trial court designated defendant a dangerous offender and imposed a twenty-five year sentence.

Defendant presents the following issues for review by this Court:

1.  Whether the District Court properly admitted into evidence tape recordings of conversations that were monitored with the consent of one of the conversants and prior judicial authorization.

2.  Whether the District Court properly admitted into evidence the drugs that were sold to the undercover operative and thereafter delivered by him to the authorities.

3.  Whether there was "governmental impropriety" in this case that would require reversal of defendant's conviction.

Defendant contends that the information acquired during the unauthorized electronic surveillance on October 17, 18

-4-

and 26, 1978, was in fact used to support the application for the November 3, 1978, authorization to conduct electronic surveillance. Information acquired during the November 3, 1978, authorized monitoring was introduced at trial in the form of both tape recordings as well as transcripts thereof. As a result of the initial illegal recording and the court's reliance thereon, defendant contends all subsequent applications to monitor and all evidence obtained therefrom were tainted. We disagree.

Applying the principles announced in State v. Hanley (1980), ___ Mont. ____, 608 P.2d 104, 37 St.Rep. 427, and earlier cases, to the facts of the present case, it is clear that the trial court's evidentiary rulings were correct.

Warrantless monitoring occurred October 17, 18 and 26. In each instance Carrier met with defendant at defendant's residence. The trial court correctly granted defendant's motion to suppress the recordings made of conversations that were monitored on these occasions. This Court held in State v. Brackman (1978), ____ Mont. ___, 582 P.2d 1216, 1222, 35 St.Rep. 1103, that tape recordings and transcripts obtained through the use of an unauthorized electronic monitoring device were properly suppressed on constitutional grounds.

The Billings criminal investigators obtained judicial authorization for the monitoring that occurred November 3, November 7, and December 4, 1978. The trial court properly admitted the tape recordings of the November 3 and November 7 conversations. The recordings of conversations monitored with the consent of one of the conversants and with judicial authority are not subject to suppression. See State v. Hanley, supra. Further, as we noted in State v. Brubaker (1979), ___ Mont. ___, 602 P.2d 974, 36 St.Rep. 1915, tape

recorded statements may be considered direct evidence or corroborative evidence and are subject to the same tests for admissibility as the direct evidence of eyewitnesses or the testimony of witnesses to oral statements. The question of admissibility of this kind of evidence is a matter for the sound discretion of the trial judge.

Defendant specifically asserts that an application for the authorization to conduct electronic surveillance which is based upon prior illegal eavesdropping may not sustain a subsequent lawful application. Defendant argues that the law enforcement officials directly relied upon such information in making an application for the authorization order. The conversations were recorded without defendant's knowledge. All evidence, therefore, used against him was tainted and should have been suppressed pursuant to the doctrine of "the fruits of the poisonous tree."

We find this factual situation very similar to that found in Hanley. In Hanley, Carrier recorded a telephone conversation in which the defendant had participated. No prior judicial authorization for that recording had been sought or received. Carrier learned of an impending drug transaction during this conversation. Argument was made that because the conversation was recorded without prior authorization, all subsequently gathered information and evidence was tainted. This Court rejected that argument and ruled that the unauthorized recordings of the telephone conversations were "wholly incidental to and did not affect the admissibility of evidence presented at trial." 608 P.2d at 108.

In the present case, Carrier, while wearing a body monitor, conversed with defendant and the conversation was

recorded. Carrier had not sought or received prior authorization for that recording.

Here, as in Hanley, Carrier's own personal observations of the initial conversations supplied adequate independent information supporting the application for electronic monitoring authorization. The application for the order authorizing the monitoring resulted in tape recordings which were admitted at trial. This application makes no reference to the fact that the earlier conversations were monitored or recorded. The application recites only the facts Carrier reported during his investigation. There is no more derivative taint in the present case than there was in Hanley.

The next issue raised by defendant is that the drugs introduced into evidence were not properly admitted. Defendant claims that as a result of the initial three incidents of unauthorized electronic surveillance, and the use thereof to obtain an order to continue electronic surveillance, all contraband seized while proceeding under such order should have been suppressed.

The drugs introduced at trial had been bought from defendant by Carrier on two occasions--October 17 and November 7. Consentual participant monitoring occurred each time. The monitoring of November 7 was authorized by court order and, therefore, the drugs seized were not tainted by illegal activity.

The consentual participant monitoring that occurred October 17, 1978, was not authorized by court order. This fact does not affect the admissibility of the drugs that defendant sold that day. Those drugs were not derived from and do not represent "fruits" of the unauthorized monitoring.

This Court addressed precisely this question in Hanley in language that is as applicable in the present case as it was there:

-7-

"The drugs introduced into evidence did not de-
rive from the monitoring and recording that
occurred. The record indicates that the law
enforcement officials obtained the drugs through
an informant, not through monitoring and record-
ing. The monitoring and recording were inci-
dental to, not the cause of, the 'seizure of the
drugs.' The informant was the independent source
of the information concerning the transaction
of the drugs themselves, and the fact that the
monitoring and recording occurred does not affect
the admissibility of the evidence. In a recent
case, State v. Ribera (1979), _____ Mont. ___,
597 P.2d 1164, 1169, 36 St.Rep. 1292, 1298-99,
this Court recognized and discussed the question
that must be answered when an illegal seizure
is alleged--that is, whether the initial ille-
gality was a cause in fact of the discovery of
the evidence. In that case, we cited Wong Sun
v. United States (1963), 371 U.S. 471, 83 S.Ct.
407, 9 L.Ed.2d 441. Here the monitoring and
recording was not a cause of the discovery of the
evidence; therefore, the exclusionary rule does
not apply even if the monitoring and recording
were to be deemed unlawful. The drugs were
properly admitted by the District Court." State
v. Hanley, supra, 608 P.2d at 110, 37 St.Rep.
at 435.

The final issue presented is whether there was govern-

mental impropriety in this case requiring reversal of defen-

dant's conviction.

Defendant argues that Carrier never met the statutory

or legal requirements to be regarded as a deputy sheriff.

Consequently, according to defendant, Carrier must be treated

by this Court as a paid informant for his part in the inves-

tigation. If the Court accepts this argument, it is further

argued that the State failed to establish Carrier's reli-

ability as an informant as required by law, and therefore,

did not establish probable cause for issuance of an order.

To resolve this issue we look to the nature of the

activity in which Carrier was involved. Criminal drug

investigations are not the traditional law enforcement

activities conducted routinely by police authorities. In

many instances, this type of investigation requires non-

-8-

traditional means within the confines of constitutional requirements. Carrier was engaged in a special assignment. His position as an undercover agent was temporary. He was attempting to penetrate the circles of drug dealing in the community of Billings. Undercover activities, especially in the narcotics field, requires secrecy and integrity of the agent in the eyes of dealers. The slightest hint of police activity would immediately terminate the criminal investigation and possibly place the lives of the agent and other officers in danger.

Montana law provides that numerous requirements are to be met before an individual can qualify as a deputy sheriff. Section 7-32-301, MCA. This statute speaks to law enforcement officials who are on a permanent basis. To require all law enforcement officials to be fully clothed with these statutory requirements in all instances would seriously jeopardize the success of law enforcement in circumstances as are presented here. This statute is a restriction on a sheriff's power of appointment.

The record indicates that Carrier had worked as a deputy sheriff on numerous prior occasions. He worked in Gallatin County as an undercover agent for the sheriff's office for several months. Later he was hired by the sheriff of Big Horn County and worked as a deputy sheriff, and finally was lent to the Yellowstone County officials to work in this case as a deputy sheriff. Carrier's prior activities in the Gallatin and Big Horn offices demonstrate his worthiness as a law enforcement official. This Court finds the testimony of Carrier's qualifications, experience and activities sufficient to meet the status of law enforcement official.

As we noted in an earlier decision, ". . . Carrier was a public employee, if not a public official. . ." State v. Hanley, 608 P.2d at 111. His official duty involved maintaining contact with persons involved in the drug scene. The Yellowstone County C.I.D. officers acted reasonably, taking these factors into account, in stating that Carrier was a deputy sheriff when applying for authorization for electronic monitoring. Applications for a search warrant are to be interpreted in a commonsense fashion. State v. White (1978), 225 Kan. 87, 587 P.2d 1259. In the commonsense understanding, Carrier was a Big Horn County deputy sheriff even though he may not have met all the technical statutory qualifications.

In his application for an order authorizing the use of electronic monitoring device, Detective Orval Hendrickson relied on the detailed observations of a fellow deputy officer, Tony Carrier. These observations included prior drug transactions between defendant and Bender and indications that a drug transaction may occur between himself and defendant. In these circumstances, the "fellow officer" rule applies. As the Supreme Court noted in United States v. Ventresca (1965), 380 U.S. 102, 111, 85 S.Ct. 741, 13 L.Ed.2d 684, "[o]bservations of a fellow officer of the government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." Carrier was "one of their number." The C.I.D. officers, therefore, could rely on his personal observations, as could the judge reviewing the application. See United States v. McCormick (7th Cir. 1962), 309 F.2d 367, 372; Weise v. United States (9th Cir. 1958), 251 F.2d 867, 868.

The judgment of the District Court is affirmed.

_____
                    Justice

We concur:

_____
        Chief Justice

_____


_____
        Justices

-11-