No. 86-369

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

_____

STATE OF MONTANA,

        Plaintiff and Respondent,

  -vs-

ROBERT EUGENE MORSE,

        Defendant and Appellant.

_____

APPEAL FROM:  District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Joel G. Roth, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        John S. Keith, Great Falls, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
Barbara Claassen, Asst. Atty. General, Helena
Patrick L. Paul, Cascade County Attorney, Great Falls,
Montana

_____

Submitted on Briefs:  Sept. 3, 1987

Decided: November 24, 1987

Filed:  NOV 24 1987

_____
Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

Defendant Robert Morse appeals his conviction of solicitation following a jury trial in the Eighth Judicial District, Cascade County. Morse, along with codefendant Ray Brown, was charged by information on November 19, 1985 with two counts: Count I, conspiracy (aggravated kidnapping); and Count II, conspiracy (deliberate homicide). On January 24, 1986, the information was amended to include solicitation to encourage or facilitate aggravated kidnapping and deliberate homicide, a felony, against Morse only as Count III. Joint-trial was held from February 24, 1986 to March 10, 1986. The jury returned a verdict of not guilty on Count I and Count II but Morse was found guilty of solicitation. On May 9, 1986, he was sentenced to fifty years in the Montana State Prison. Brown was found not guilty on both counts.

We affirm.

The two following issues are presented for our review:

(1) Was the State's informant an accomplice and therefore legally accountable for Morse's solicitation requiring corroborating evidence prior to the informant's testimony?

(2) Did the District Court err in allowing in evidence a surveillance tape recording and testimony of an agent who conducted the surveillance?

Defendant in this case, Robert Morse (Morse), was 88 years old at the time of trial of this case. His sight had previously dissipated and therefore he could not operate an automobile. Morse, who is also known as "Goldie," met Thomas Marchington (Marchington), the informant for the State in this case, at a bar in Billings, Montana, while the two were playing poker. Marchington was asked by Morse if he wanted

2

to earn some money for doing something illegal. It was not made clear to Marchington originally what the act would be, but Marchington was interested.

In May and April of 1985, Marchington told agent Steve Sparhawk (Sparhawk) of the Montana Department of Justice Law Enforcement Services Division that Morse approached Marchington and was planning something illegal. Sparhawk and Marchington had previously met regarding matters unrelated to this case. When Marchington first discussed Morse's offer with Sparhawk, he testified he did not intend to do what Morse had suggested. Marchington testified that Morse would pay Marchington for transporting him to Great Falls, that they would pick up a number of people, and that Marchington would transport them back to Billings.

Approximately a month after Marchington contacted Sparhawk, Morse again asked Marchington if he was interested in participating in the illegal activity for a large amount of money. Marchington still did not know what the specific activity was, but at trial testified: "I told him I was always interested in trying to get some money." Marchington did not immediately report Morse's request to Sparhawk.

By late summer or early autumn of 1985, Marchington began driving Morse to Great Falls in Morse's car. Marchington still did not know what illegal activity was involved. Morse told him not to bring any weapon.

On the first trip to Great Falls, Marchington said he left Morse at the Greyhound Bus depot at approximately 1:00 p.m. Morse gave Marchington $20 and told him not to get drunk but to return with the car around 4:00 p.m. Marchington said he left the car parked in a parking lot across from the bus depot, and watched Morse get picked up in a blue El Camino driven by a black man. Morse returned later that afternoon and Marchington and Morse drove back to

3

Billings. There were a number of trips between Billings and Great Falls after this first trip and Morse often mentioned people that he talked to in Great Falls. One of these people was Ray Brown, whom Marchington was introduced to later. Brown was also referred to by Morse as "Brown" or "Brownie." Brown is a black man and owns a blue El Camino.

Marchington again contacted Sparhawk on October 15, 1985. Marchington had been given more information as to what the intended crime was to be by this meeting. By October 15, Marchington had driven Morse to Great Falls approximately seven or eight times. Marchington told Sparhawk of Morse's plans in a taped conversation. The alleged scheme was to pick up Dr. John McGregor, a Great Falls physician, and possibly McGregor's wife, and hold them for ransom. The kidnapping allegedly would entail threatening the victims into writing ransom notes and then end in the murder of the victims.

On October 22, 1985, Marchington notified Sparhawk that he was again driving Morse to Great Falls. Before he left Billings, Marchington met with another state agent, Ward McKay (McKay) who attached an electronic transmitter on Marchington so that any conversation could be heard and taped.

Morse and Marchington were followed to Great Falls by agents from Billings. These agents and Great Falls police officers watched them drive by Dr. McGregor's house. The McGregors had been transported from Great Falls for protection purposes. Marchington testified that he and Morse drove past the McGregor's residence in the early evening of October 22 and saw a man and woman inside but no vehicle. Morse became suspicious because of the lack of a car. A similar type vehicle as the McGregors' was obtained by the Great Falls officers and placed at the McGregor residence at

4

8:15 p.m. At approximately 9:00 p.m., they again drove by the house and noticed a new Lincoln automobile with a thirty-day sticker but no license plates. Morse at this time became fairly nervous according to Marchington. In fact, the individuals inside the McGregor residence were actually undercover police officers. On October 23, Morse and Marchington made one more pass by the McGregors' and again noticed people inside but no vehicle. Morse was arrested later that day when he and Marchington stopped at a trailer rental business.

At trial, Marchington stated that he and Morse, on a number of occasions, watched Dr. McGregor at his house and work. The two also drove to an area on the Missouri River known as "Big Bend" where the bodies were allegedly to be disposed. Marchington said Morse had to unlock two padlocks to get to Big Bend and Morse had keys to the padlocks. This property adjacent to the river is owned by Harry Mitchell who testified that he had previously given two keys, one marked "BB," to Ray Brown approximately four or five years before trial. Morse was found in possession of these or similar keys when he was arrested.

Marchington testified that Morse had a number of items that he always carried in two bags in the trunk of his car that were to be used in the kidnapping, murder and dismemberment of the victims. These items included pencils, pens, paper, a typewriter, a set of handcuffs and a .38 revolver which were to be used to coerce the victims into writing ransom notes. Marchington testified that he saw a rubber raft, hammer, chisel, flashlight, hacksaw, and two knives, a shovel and a small board which were to be used to dismember and dispose of the bodies. Also, there were newspapers to be used to burn the victim's hair off and hinder identification.

5

The initial information was filed November 19, 1985, and Morse was arraigned and entered a plea of not guilty on December 2, 1985. He entered a plea of not guilty to the amended information on January 24, 1986.

At trial, much of the State's case was based on the testimony of Marchington. Seven Great Falls police officers, a Cascade County sheriff's deputy, and three investigators (along with Sparhawk) from the Department of Justice also testified. One of the investigators was McKay. McKay placed the transmitter on Marchington and followed Marchington and Morse to Great Falls. He testified as to portions of eight tape-recordings made during the surveillance of October 22 and 23, 1985. Portions of the tapes were difficult to hear and understand so McKay was allowed by the District Court to describe what he saw and heard.

Morse contends on this appeal that the District Court's allowance of Marchington's testimony was error because he was an accomplice to the solicitation charge and no corroborating evidence was presented to support his testimony. Morse argues that as a coconspirator and accomplice Marchington's testimony had to be limited as provided in § 46-16-213, MCA, which provides:

> A conviction cannot be had on the testimony of one responsible or legally accountable for the same offense, as defined in 45-2-301, unless the testimony is corroborated by other evidence which in itself and without the aid of the testimony of the one responsible or legally accountable for the same offense tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

Section 45-2-302(3), MCA, defines the elements of being an accomplice that could apply in this case. One is legally accountable for another's conduct if "[e]ither before or during the commission of an offense with the purpose to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid such other person in the planning or commission of the offense." Morse contends that in Marchington's own testimony he admitted that he and Morse discussed the proposed criminal activity, and Marchington did not advise the authorities.

> Q. When Morse asked you if you were interested in this--still interested in this activity about a month after you talked to Sparhawk, did you tell Sparhawk about that conversation?
>
> A. No.
>
> Q. Why not?
>
> A. I was interested in getting some money in my pocket.

This statement, Morse argues, shows that Marchington should be accountable for Morse's actions as an accomplice because he was aiding Morse. When this statement was made, Marchington was still unaware of what criminal activity was involved. The referenced testimony occurred approximately June of the summer of 1985. It was not until August or September of 1985 that Marchington began driving Morse to Great Falls for surveillance of Dr. McGregor and it was not until later in the fall that he realized what crime was to be committed.

> Q. Prior to your first trip to Great Falls, did you have any more discussion about what this criminal activity would be?
>
> A. No, not until after the first trip.

7

Q. Okay. Do you recall about when the first trip to Great Falls was?

A. Late summer or early fall. August, September, somewhere in there.

. . .

Q. During this period of time prior to October 15th when you were to see Sparhawk again, were you ever given any more details of what the criminal activity was supposed to entail?

A. Yes.

Q. Was that on one occasion or on more than one occasion?

A. A little bit here and there.

Q. Bits and pieces?

A. Bits and pieces.

Q. Do you recall the next thing you heard about the activity?

A. That he was going to pick up Dr. John and/or his wife.

Q. Did he give you anything more than "Dr. John"?

A. That and the address where they lived. He had me go past the doctor's house.

. . .

Q. Okay. When did you first discuss with Morse what specifically you were to do with Dr. John?

A. Morse went--started going into detail on one trip back to Billings here.

Q. Do you recall about when that trip was or which trip it was?

8

A. I am not positive when it was . . .

Although the testimony shows that the exact time period is unclear as to when Marchington finally determined that the crime of kidnapping was going to occur, it is clear the knowledge was obtained much later than June when he made the damaging statement on which Morse relies. Marchington contacted Sparhawk and informed him of Morse's plan on October 15, 1985.

Section 45-2-302, MCA, has an exception to subsection (3) that aids in determination of this case which states:

> [H]owever, a person is not so accountable if:
>
> . . .
>
> (b) before the commission of the offense, he terminates his effort to promote or facilitate such commission and does one of the following:
>
> . . .
>
> (ii) gives timely warning to the proper law enforcement authorities . . . (Emphasis added.)

Marchington did indeed give notice to Officer Sparhawk and as a result, the actual commission of the crime did not occur. A plain reading of this statute shows Marchington is not accountable for any crime. He was not an accomplice to the offense of solicitation.

The law regarding accountability on the part of an accomplice is well settled. Section 45-2-302, MCA, has been interpreted by this Court and from the testimony presented at the District Court, we can find no accountability on the part of Marchington for the crime of solicitation:

> [Accountability] has been the subject of much attention in case law. We have

9

emphasized that mere presence at the scene of a crime is not enough to charge one as an accomplice. State v. Fish (Mont. 1980), 621 P.2d 1072, 1078, 37 St.Rep. 2065, 2071; State ex rel. Murphy v. McKinnon (1976), 171 Mont. 120, 125, 556 P.2d 906, 909. Moreover, the mere knowledge that a crime is about to be committed does not make one an accomplice. State v. Harvey (1979), 184 Mont. 423, 431, 603 P.2d 661, 666; State v. Mercer (1943), 114 Mont. 142, 152, 133 P.2d 358, 361. A true accomplice is:

"'one who knowingly, voluntarily and with common intent with the principal offender unites in the commission of a crime . . . One may become an accomplice by being present and joining in the criminal act, by aiding and abetting another in its commission, or not being present, by advising and encouraging its commission; but knowledge and voluntary actions are essential in order to impute guilt.'" (Citations omitted.)

State v. Nordahl (Mont. 1984), 679 P.2d 241, 243, 41 St.Rep. 502, 504.

Marchington did not have the common intent to commit the crime of solicitation. His testimony shows that it was only after he received "bits and pieces" of information that he fully understood what Morse planned to do. Once the entire plot was understood by Marchington, he informed Sparhawk and therefore the exception of § 45-2-302(3), MCA, is applicable. At any rate, Marchington could not be accountable for the crime of solicitation of which Morse was convicted.

Counsel for Morse did make a motion in limine to have the court rule that Marchington was an accomplice/coconspirator and to therefore limit his testimony until corroborating evidence was first presented. However,

10

the requirement of § 46-16-213, MCA, requiring corroborating evidence is applicable only if Marchington was in fact an accomplice or accountable for Morse's solicitation. The District Court denied Morse's motion and stated it would not require the State to present its case in a particular fashion.

The State points to the fact that Morse was not convicted of conspiracy (kidnapping), or conspiracy (deliberate homicide), as he was originally charged. Morse was convicted of solicitation pursuant to § 45-4-101, MCA, which provides:

> (1) A person commits the offense of solicitation when, with the purpose that an offense be committed, he commands, encourages, or facilitates the commission of that offense.

Therefore, any claim relating to conspiracy is irrelevant in this case. We are bound to determine the merits of Morse's claim on the solicitation conviction only. Solicitation is distinct from the crime of conspiracy. Solicitation requires that the solicitor "attempt[s] to enlist coconspirators" to commit a crime. Compiler's Comments, Vol 5, MCA Annot. at 121, § 45-4-101, MCA. There was never any allegation nor evidence presented that Marchington attempted to persuade any other person to facilitate any criminal activity. The jury's finding was based on the solicitation of Marchington by Morse to facilitate the crimes of kidnapping and deliberate homicide.

Nonetheless, the testimony of Marchington was corroborated numerous times. "[T]he corroboration is sufficient if, 'unaided by the testimony of an accomplice, it tends to connect the defendant with the commission of the offense.'" State v. Gonyea (Mont. 1987), 730 P.2d 424, 427 44 St.Rep. 39, 42. The officers investigating this case

11

testified that they followed Marchington and Morse from Billings to Great Falls. The route chosen was exactly as told to them by Marchington. Marchington and Morse were observed driving by Dr. McGregor's house on a number of occasions on October 22, 1985. The instruments, tools and other objects the officers were told by Marchington were in Morse's car were indeed found by investigating officers and independently introduced into evidence. Evidence was also presented that showed a new muffler was installed on Morse's automobile in Great Falls during this period of time, and the mechanic described Morse and Marchington together in that vehicle. Newspapers were found in the back of Morse's automobile with dates similar to the period of time in which Marchington and Morse were to have made other trips to Great Falls prior to October 15, 1985. Keys which opened the gates onto the Mitchell property, one of which had printed on it "BB"--for Big Bend, the area where the McGregors were to be executed--were found on Morse and identified by Harry Mitchell.

All of this evidence tends to connect Morse with the commission of the offense of solicitation without the courtroom testimony by Marchington. This corroborating evidence was all introduced and the jury needed only the testimony of Marchington, who was not an accomplice, to find the elements of the crime.

We recognize that this Court has previously stated that when there are disputed facts as to whether a person is an accomplice that the issue is one for the jury under proper instruction. Gonyea, supra 730 P.2d at 425, 44 St.Rep. at 40. But in this instance, there was no disputed fact that Marchington properly alerted the authorities and aided in the prevention of a possible heinous crime. The District Court

12

therefore properly ruled as a matter of law that Marchington was not an accomplice.

Morse also contends that the District Court erred in admitting surveillance tapes into evidence of the trip from Billings on October 22 and 23, 1985. The District Court acknowledged that much of the recorded conversation was inaudible. However, the District Court allowed officer McKay to act as an "oral transcriber," interpreting what was said on the tapes and what occurred while the statements were made.

The policy behind the use of transmitters on informants was enunciated in State v. Hanley (1980), 186 Mont. 410, 608 P.2d 104, a case involving the recording of a drug transaction by an informant:

> The general rule is that it is impermissible for police officers to intercept, transmit or record private conversations; however, if one of the parties to the conversation consents, even an informer, such actions are legal. People v. Patrick (1973), 46 Mich.App. 678, 208 N.W.2d 604; United States v. Mendoza (U.S.C.A. 5th, 1978), 574 F.2d 1373, rehearing denied 579 F.2d 644. This is true as long as the will of the consenting party has not been subjected to overbearing pressure from the authorities.

Hanely, 186 Mont at 419, 608 P.2d at 109.

We have previously held that the use of tape recordings is acceptable and is a question left to the discretion of the trial court. State v. Bassett (1980), 189 Mont. 28, 614 P.2d 1054; Hanley, supra; and State v. Brubaker (1979), 184 Mont. 294, 602 P.2d 974. In Bassett, we stated:

> The recordings of conversations monitored with the consent of one of the conversants and with judicial authority are not subject to suppression. See

13

> State v. Hanley, supra. Further, as we noted in State v. Brubaker (1979), Mont., 602 P.2d 974, 36 St.Rep. 1915, tape recorded statements may be considered direct evidence or corroborative evidence and are subject to the same test for admissibility as the direct evidence of eyewitnesses or the testimony of witnesses to oral statements. The question of admissibility of this kind of evidence is a matter for the sound discretion of the trial judge. (Emphasis added.)

Bassett, supra, 189 Mont. at 32-33, 602 P.2d at 1056.

Under the facts of this case, Marchington was a willing participant in the tape recording. There was no allegation of overbearing pressure ever made. Morse did not object to the tapes on any ground other than that they were of poor quality and inaudible and he argued it was unfair prejudice to allow McKay to interpret them. Morse cites United States v. Frazier (2nd. Cir. 1973), 479 F.2d 983, as controlling because of the possible inference the jury could make from unintelligible recordings and due to the substantial impact that an inaudible recording may have on the jury. The Frazier case involved a tape which was found by the trial judge to be "75% unintelligible." The tape was made by the appellant who was later convicted without the use of the tape. The court initially refused to allow appellant's counsel to introduce the tape because of its poor quality. The court later ruled the tape would be allowed if accompanied by an explanation by the judge that he considered the majority of the tape inaudible and that counsel had failed to provide the court with a transcript of the recorded conversation. Frazier, supra, 479 F.2d at 985. The attorney for the appellant decided not to use the tape under these

14

conditions but it is noted that the tape was still made available.

In the case at bar, the District Court allowed the use of the tape and testimony of McKay but included a specific instruction to the jury which stated:

> Tape recordings of conversations identified by witnesses have been received in evidence. An interpretation was furnished by Agent McKay for your guidance as you listened to the tapes, clarifying portions of the tapes which were difficult to hear and identifying speakers. The tapes, however, are evidence in the case and interpretation of those tapes by Agent McKay is not evidence. If you perceive any variation you will be guided solely by the tapes and not by Agent McKay's interpretation.
>
> If you cannot determine from the tape that particular words were spoken you must disregard the interpretation insofar as those words are concerned.

We find this instruction proper.

Frazier further supports Brubaker, Hanley and Bassett in that the Frazier court noted that "[a] trial judge has wide discretion in determining whether to allow a recording to be played before the jury when there is a serious question of its audibility." Frazier, supra, 479 F.2d at 985.

Additional authority is found in United States v. Jones (10th Cir. 1976), 540 F.2d 456, cert. denied, 429 U.S. 1011, where poor quality tapes were played to the jury while an informer testified as to what was said. The appellate court held the trial court had not abused its discretion:

> Where a tape recording is objected to as unintelligible or inaudible its admissibility is within the sound discretion of the trial judge. United States v. Hodges, 480 F.2d 229, 233-34 (10th Cir.). Unless the unintelligible

15

> portions are so substantial as to render the recording as a whole untrustworthy, it may be admitted; this is especially so where a witness who heard the statements also testifies and the recording gives independent support to his testimony.

Jones, supra, 540 F.2d at 470. The District Court properly allowed McKay to interpret the tape in this case.

Finally, Morse contends he was prejudiced by the District Court allowing the jury to take the tape recordings into deliberations. The District Court denied a motion for mistrial on the grounds that the jury had already heard the testimony and tapes. This again is subject to the discretion of the court. Section 46-16-504, MCA, states:

> Upon retiring for deliberation, the jury may take with them all papers which have been received as evidence in the cause, except depositions or copies of such papers as ought not, in the opinion of the court, to be taken from the person having them in his possession. The jury may also take with them any exhibits which the court may deem proper and notes of the proceedings taken by themselves. (Emphasis added.)

The tapes had been admitted into evidence by the District Court and the jury was properly instructed as to the weight to give the tapes. Those portions the jury could not understand were to be disregarded entirely. Just as with papers which have been properly admitted into evidence that are allowed in the jury room during deliberations, the tapes were evidence which at the discretion of the court could be allowed. We do not find abuse of discretion by the court.

The conviction is affirmed.

_____
Justice

We concur:

_J. A. Turnage_
Chief Justice

_John Conway Harrison_

_Frank J. Haswell_

_R. C. McDonough_
Justices